VINCENT J. REINKE, Appellee, vs. THE SANITARY DISTRICT OF CHICAGO, Appellant.

*Opinion filed October 28, 1913—Rehearing denied Dec. 4, 1913.*

1. EVIDENCE—*when copy of a claim, and testimony supporting it, are too remote in time.* In an action against the Sanitary District of Chicago for damages to land caused by overflow, resulting from turning the waters of the district into the Illinois river in the year 1900, a copy of a claim, and of the testimony supporting it, for damages resulting to a small portion of the same land from the construction of the dam in the Illinois river at Henry in the year 1871 are too remote in point of time and not admissible.

2. SAME—*the market value of land—how shown.* In an action against the Sanitary District of Chicago for damages for permanent injury to land from overflow, a witness who has stated what the land in controversy was worth, as a whole, may properly be asked to state the value of the different portions of the land as divided into farm land, slough and wood land.

3. SAME—*rule where land is owned by different persons.* A question as to the fair cash market value of land or interests owned by different persons should be limited to the particular interest of the person in the land concerning which the witness is testifying.

4. SAME—*models, maps and diagrams are admissible as illustrative of testimony.* It is proper to receive in evidence models, maps and diagrams designed to give more accurate information concerning objects or places which cannot be conveniently shown or described to the jury, or which tend by graphic representation to enable the jury to more clearly understand the testimony.

5. SAME—*when a tabulation tending to show duration of overflow is admissible.* In an action for damages from overflow of lands it is proper to admit in evidence a tabulation showing the duration and extent of the overflow on the cultivatable lands in controversy for certain years, based upon government records of gauge readings taken from the United States weather bureau, which records had been previously received in evidence.

6. SAME—*contour maps of government survey are admissible in an action for overflow of lands.* Contour maps of the government survey showing the elevation of a particular piece of land in controversy are admissible in evidence in an action for damages for an overflow, subject to proof of the incorrectness of those

maps or that there had been a material change in the elevation of the land since the maps were made.

7. SAME—*expert testimony as to overflowed lands is admissible.* In an action for damages resulting from the overflow of lands by reason of the opening of the channel of a sanitary district, expert testimony is admissible as to what land would be covered by water at a given time, based upon contour maps, rainfalls, gauge readings, and other data of like nature which it is a part of the business of a skilled engineer to understand, although the witness is not personally familiar with the condition of the land on the various dates in question; but the admission of testimony of this character rests largely in the sound discretion of the trial court, in view of all the facts and circumstances of the case.

8. SAME—*objection to evidence must be specific.* An objection to the question, "What, in your opinion, was the fair cash market value on that date for any purposes for which you think it was reasonably adapted?" upon the ground that the question contemplates a use of land other than the witness has been asked about, does not raise the point that the question assumes that the plaintiff owns the fee, including fire clay and coal underlying it.

9. INSTRUCTIONS—*measure of damages for overflow of lands.* The true measure of damages in an action for permanent injury to land, caused by opening the channel of a sanitary district, is the difference between the fair cash value of the land immediately before and after the water was turned in, and an instruction which does not limit the fair cash market value of the land is erroneous.

10. SAME—*when instruction as to right to overflow lands is not misleading.* In an action for damages for overflowing lands by the Sanitary District of Chicago, an instruction which states that the defendant had "no right to cause to flow on plaintiff's land any water that would not flow thereon in a state of nature" is not misleading, though the act under which the defendant was organized authorizes it to overflow lands but makes it liable for damages from such overflow.

11. SOLICITORS' FEES—*allowance should be usual charge under all circumstances.* In taxing attorney's fees in an action against a sanitary district the court should exercise its own judgment, based on its own knowledge and experience in such matters, and is not necessarily governed by the opinions of attorneys as to the value of the services, and the allowance should be the usual charge for services between the parties under like circumstances, and not what is reasonable or proper for a given attorney in a particular case.

APPEAL from the Circuit Court of Bureau county; the Hon. JOE A. DAVIS, Judge, presiding.

EDMUND D. ADCOCK, and JOHN DAILEY, (OSCAR H. OLSEN, of counsel,) for appellant.

DUNCAN, DOYLE & O'CONOR, and J. L. O'DONNELL, (CAIRO A. TRIMBLE, of counsel,) for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was a suit brought by appellee against appellant, in the circuit court of Bureau county, to recover damages for injuries to appellee's land, located about one mile west of Spring Valley, in said county. After issue joined, trial was had and a verdict returned by the jury in favor of appellee for $3700, upon which verdict judgment was rendered. The trial court assessed as a part of the costs of the case the sum of $2400 as attorney's fees for appellee. From the judgment thus entered this appeal was prayed.

The land in question was on the north bank of the Illinois river, lying between the river and the right of way of the Rock Island railroad. Appellee's riparian rights extended to the center thread of the river, but the testimony is not in accord as to how many acres of land was in the bed of the river. The evidence, however, tends to show he owned about 254 acres not included in the natural bed of the river; that approximately 59 acres of this was included in one large and two small sloughs, and that approximately 121 acres was subject to cultivation and some 60 acres was timber land; that the waters of Lake Michigan were first diverted into the Illinois river by way of the Desplaines river on January 17, 1900; that appellant has increased the amount of water turned into the Desplaines river and then into the Illinois from 1900, when the record shows it was turning in 184,000 cubic feet per minute, to 1907, when it was turning in 307,000 cubic feet per minute; that the

sanitary district channel, when the declaration was filed, in 1905, was being improved in the city of Chicago so as to permit a flow of 480,000 cubic feet per minute, and that the law required a capacity in said channel of 600,000 cubic feet per minute. The case was tried upon the theory that appellee's action was for a recovery of all damages, present and future, resulting from the construction and operation of the channel.

The evidence for appellee tended to show that this land was located so near to the city of Spring Valley that teamsters and others living there could rent from appellee portions of the land each summer and plant it to corn; that the soil was rich and the cultivated portions produced large quantities of corn before the water from the sanitary channel was turned into the river, the witnesses for appellee swearing that the land was worth before 1900, when said water was turned in, all the way from $35 to $80 an acre, some stating that these figures referred to the cultivated and timber land but not to the sloughs; that for the years immediately preceding 1900 much of the land was rented for $5 an acre; that for the first year or two after that date some of the land was subject to cultivation, but since 1902, on account of the high water, very little of it had raised crops; that from the timber land before 1900 much timber was cut and sold for mine props; that since 1900 the land was practically valueless, not being worth more than $5 to $10 an acre; that the timber had been destroyed.

The testimony of appellant tends to show that practically all of the good timber was cut from the land previous to 1902; that previous to 1900 none of the land could be cultivated regularly every year, as it was subject to frequent overflow of the Illinois river during the planting, growing and harvesting seasons; that occasionally corn was raised thereon previous to 1900; that appellee rented out the land in small patches, ranging from three acres to about sixty acres; that the tenants were not regular farmers, but

were teamsters, coal miners and others; that the leases from appellee to his tenants each contained a provision that the payment of rent was subject to the tenant being able to raise a crop; that there were no structures upon the land of any kind, either temporary or permanent, and never had been, except a saw mill on the highest part for two or three years; that there were no fences; that the land had always been subject to the overflow of the Illinois river, even before the building of the Henry dam, in 1871, some distance below the farm. The witnesses for appellant testified that before 1900 the land, as a whole, was not worth more than $10 an acre, some putting it as low as $5 or $7 an acre; that the largest slough on the land,—the Grisond slough,— covered between 50 and 60 acres, being a little higher than the river and land-locked, fed by creeks and surface water, and only in times of heavy rains overflowing into the river. The evidence also showed, uncontradicted, that a large sewer from Spring Valley emptied into this slough.

No evidence of sales of land in the near vicinity is found in the record. Appellee bought 145 acres of this land in 1892 from one Nancy Hackman, the deed showing a consideration of $1250. Evidence was introduced by appellant showing that for the years 1895, 1896 and 1897 appellee had made affidavits before the board of supervisors of Bureau county asking for rebates on taxes, in which he stated that 80 acres of this land was nearly all the time covered by water and was almost worthless, not being worth $5 an acre. A neighbor of appellee made a written statement to the board of supervisors at the same time, corroborating one of these affidavits by appellee as to the value of the 80 acres of land, and the assessor for one of these years stated to the board, in writing on the back of the other affidavit, that he thought the claim of $5 per acre value was correct. Appellee, on cross-examination, in this record, admitted that he had made the affidavits in ques-

tion and presumed they stated the truth as to the value of the land and other conditions.

Appellant argues that the court erred in its rulings as to the admission and exclusion of evidence. The evidence tends to show that the construction of the Henry dam some miles below this property, in 1871, raised the water across Tree-top bar, adjacent to this land, from five to seven feet. It appears from the record that the land owners above the dam claimed damages from the State of Illinois from its erection, and that in 1877 a joint resolution was passed by the General Assembly of the State authorizing a joint committee to investigate all claims arising from damages by reason of the construction of said dam. The record shows that Noah Hackman and Nicholas Bearse owned at that time a part of the land here in question. Both of them claimed damages for the overflow of their lands on account of the dam, which claims were filed in the Auditor's office at Springfield. Noah Hackman, on January 2, 1880, executed a release to the State for all damages occasioned by reason of the construction of the dam, which was filed for record in Bureau county. The heirs of Noah Hackman afterward conveyed to the widow, and through her the title to 145 acres of the land here in question was acquired by appellee. The joint resolution and said release were allowed in evidence by the court. Appellant also offered a certified copy of the testimony of Noah Hackman before said joint committee, found on file with the Auditor of Public Accounts. The court refused to admit this evidence, and also refused to admit the copy of the claim of Nicholas Bearse filed before the joint committee, in which he stated that 50 acres of land included in this declaration was damaged $750 by the construction of said dam. This evidence was too remote in point of time and was properly excluded.

The appellant further contends that objections were improperly sustained to questions its counsel asked of Emil

260 — 25

Stempfer, offered by it, with reference to the fair cash value of appellee's land. These questions attempted to have the witness state the value of the different portions of the land. The objection was, that the witness having stated what the land, as a whole, was worth, it was improper to ask him to divide it and state the value of the different portions,—that is, what the farm land, the slough and the wood land each was worth. The questions were proper and the court should have permitted them to be answered.

Appellant further insists that the court erred in refusing to allow in evidence certain charts and diagrams illustrating the testimony of three of its witnesses. Among these charts or diagrams were Exhibits 172, 173 and 175. On the first the witnesses had constructed columns to show the amount of rainfall for each year from 1893 to 1910. For the years from 1902 to 1910 the columns were colored red and for those from 1893 to 1901 green. They were drawn to a scale, so that a half inch on the chart represented one inch of rainfall, the longest column showing the heaviest rainfall. Exhibit 173 was similarly constructed from computations showing the rainfall during the agricultural season for each of said years. Exhibit 175 was a chart showing the low water at the crest of the Henry dam, made up from information obtained from the government report and from the gauge readings introduced in evidence for the years in question. From these gauge readings a witness gave the various elevations of the water, and also computed the depth of the water in each case on the crest of the dam. These charts or exhibits illustrated in a graphic way the results of evidence already admitted. The evidence showing these results in detail consisted of a mass of figures filling many pages of the record, which might well have been practically meaningless to the jury in the absence of any concrete conclusions drawn from them by expert witnesses. The exhibits were similar to those used by the United States government in its reports presenting results on similar sub-

jects. The contention of appellee on the trial was, that the Illinois river had been higher during certain years next prior to the trial than formerly, and the object of introducing the evidence which these exhibits illustrated was to attempt to show that the rainfall during such years was an important factor in the height of the river.

It is the constant practice in the courts to receive in evidence models, maps and diagrams for the purpose of giving more accurate information of objects or places which cannot be conveniently shown or described to the jury. Such documents often conduce to a clear and comprehensive understanding of the testimony introduced. The diagram, drawings or models are not introduced as evidence within themselves but for the purpose of enabling the jury to understand and apply the testimony in the case. (Jones on Evidence,—2d ed.—411; 4 Ency. of Evidence, 636, and cases cited; *Justen* v. *Schaaf,* 175 Ill. 45; *Pennsylvania Coal Co.* v. *Kelly,* 156 id. 9; *Rehfuss* v. *Hill,* 243 id. 140; 17 Cyc. 412.) Experts are allowed to examine complicated accounts, books and records and give their conclusion of what they contain. Frequently any other course would cause a great loss of time and tend to confuse the jury. (Jones on Evidence,—2d ed.—sec. 206; 2 Wigmore on Evidence, sec. 1230; *Cooke* v. *People,* 231 Ill. 9; *Boston & W. Railroad Co.* v. *Dana,* 1 Gray, 83.) The court may naturally require the production of the originals, as was done in this case.

The court refused to admit Exhibit 232, which was something of the same nature as the exhibits already considered, being a tabulation showing the duration and extent of the overflow on the cultivatable lands in controversy for each year from 1875 to 1899, inclusive. It was based on government records of gauge readings at the Henry lock, upper level, taken from the United States weather bureau report of 1902-04 of the Illinois valley, which had been admitted in evidence. The contour map of the government

survey was also admitted and was used as one of. the sources of the tabulation. The purpose of this tabulation was to show that the land in question had always been subject to overflow, and the frequency and extent of such overflow, before the water was turned into the channel of appellant. The witness testifying to this, stated that his conclusions were based on the government map, on contour· areas compiled from the records included in the government reports, and upon the gauge readings at Henry; that from his personal knowledge of the land, his knowledge of the river and the government records in evidence, based on his experience as an engineer, he was able to state what portion of appellee's lands would be overflowed by the Illinois river at the various stages for any year or month or for any period from 1875 to 1899. The court sustained objections to the exhibit, and also refused to allow the witness to testify orally as to the overflow of appellee's lands at various times during the years in question. So far as we can judge from the record the objection to this evidence was sustained because the witness himself was not personally familiar with the condition of appellee's lands on the various dates in question. Naturally, the witness' testimony would not be controlling but its weight would be judged by the jury. Engineers of requisite skill may testify as to what amount of land will be overflowed with water within certain embankments where kept at a given height, as to the causes and effect of the overflow of a street at given places, as to the probabilities that a lake would overflow a given area, and similar questions. (Jones on Evidence,—2d ed.—384.) Contour maps of the government survey showing the elevations of this land had already been introduced in evidence. Of course, if the contour maps were not correct or if there had been any material change in the elevation of the land since the maps were made, that would be entirely proper to prove. The ordinary man serving on a jury would not understand very

clearly the elevations of the land from a contour map, but would easily comprehend the testimony of an expert witness as to what land would be covered by water at a given time, based upon a contour map, rainfalls, gauge readings, and other data of like nature which it is a part of the business of a skilled engineer to understand. The same reasoning applies to Exhibits 243 and 244, which showed in a brief way the height of the water for each day of September and October, 1911, at Brandon's bridge, Joliet, and at lock 15 at LaSalle. What is said here also applies to Exhibit 250. This latter was a profile of the Illinois river, based on record evidence already introduced. The admission of testimony of this character rests largely in the sound discretion of the trial court, in view of all the facts and circumstances of the case. While we would not reverse this case solely because of the rulings on this testimony, we think it was admissible.

The declaration described the land and stated that appellee was the owner, except the coal and fire clay underlying it and the right to remove the same without entering upon or occupying any part of the surface of the land. Only four witnesses for appellee testified as to the fair cash market value of the land just before the water was turned in. One of them was asked, "What, in your opinion, was the fair cash market value on that date for any purposes for which you think it was reasonably adapted?" A similar question was put to the other three. Objection was made to this question as to at least three of the witnesses, on the ground that no proper foundation had been laid and that the question contemplated a use of the land other than the witnesses had been asked about. The objection was overruled and the question answered. It is now insisted by appellant that these questions all assumed that appellee was the owner of the fee, not excepting the fire clay and coal underlying it. The question should have been limited to the interest of appellee in the lands concerning which the

witnesses were testifying.   We think, however, that coun-
sel for. appellant should have stated their objection on this
point with more particularity.   The objection was of such
a nature that counsel for appellee, and the court, may have
misunderstood that the objection now raised was the one
then urged.   In this connection it is argued that because of
the nature of this evidence and the nature of the title owned
by appellee he did not prove his title as required under the
pleadings, appellant having filed a plea of non-ownership.
The evidence of these witnesses as to the value had no
bearing on the question whether the title in the fee was
shown by the record to be in appellee. ' We do not under-
stand from the briefs that appellant contends that the title
was not proven to be in appellee as stated in the declara-
tion, except, possibly, in the particular that the deed from
Nancy Hackman to the appellee especially reserved all her
homestead exemption rights and the declaration did not so
state the title.

Appellant argues that certain instructions of appellee
were erroneous.   It is insisted that the first instruction given
for appellee is wrong because it does not limit the fair cash
market value of the land to the time immediately before
the water was turned into appellant's channel.   The true
measure of damages caused by the turning in of the water
is the difference between the fair cash value of the land
immediately before the water was turned in and after the
water was turned in.   (*Beidler* v. *Sanitary District,* 211
Ill. 628.)   The instruction in question was not accurate on
this point.

The second instruction is objected to because it stated
that the sanitary district had "no right to cause to flow on
plaintiff's land any water that would not flow thereon in a
state of nature," the argument being, that the law under
which the sanitary district was established permitted the
water to be turned in but made the sanitary district liable

for damages for overflowing appellee's land. We think the jury were not misled by the instruction in that regard.

The fifth instruction is criticised because it has no bearing on the issues involved, being abstract and general. The criticism is not without force.

It is further most earnestly insisted that the fees of the attorneys allowed by the trial court are excessive and that the law under which they were allowed is unconstitutional. This court has passed on this constitutional question in *Sanitary District* v. *Ray,* 199 Ill. 63, and we do not feel called upon to again review that subject. The allowance of attorney's fees should be the usual charge for services between parties under like circumstances, and not what is reasonable or proper for a given attorney in a particular case. In taxing such fees the chancellor should exercise his own judgment, based on his knowledge and experience in such matters, and not necessarily be governed by the opinions of attorneys as to the value of the services. (*Lee* v. *Lomax,* 219 Ill. 218; *Metheny* v. *Bohn,* 164 id. 495.) As the case must be reversed for other reasons, we are not required to pass on the question whether the fees already allowed were reasonable. See on this point *Gentleman* v. *Sanitary District of Chicago,* (*ante,* p. 317.)

The evidence on this record was sharply conflicting and the case was very closely contested. The points at issue were vigorously supported on one side and just as vigorously attacked on the other. While some of the errors heretofore referred to, standing alone, might not be held reversible error, considering the entire record we can reach no other conclusion than that the jury were misled by these erroneous rulings.

The judgment of the circuit court will be reversed and the cause remanded.                    *Reversed and remanded.*