THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EDWARD GEROLD, Plaintiff in Error.

*Opinion filed December 16, 1914.*

1. CRIMINAL LAW—*statute relating to change of venue should be construed the same in civil and criminal cases.* A statute relating to change of venue should receive a reasonable construction, and the construction should be the same in civil and criminal cases.

2. SAME—*the rule as to a change of venue for prejudice of the judge.* A party applying for a change of venue for prejudice of the judge obtains all the relief he is entitled to when another judge who has no interest in the case and is unprejudiced is called in to try the case.

3. SAME—*change of venue for prejudice of judge does not require removal of case to another county.* The statute providing for a change of venue because of prejudice of the judge was not enacted for the purpose of allowing a change of venue from the county, as in case of prejudice of the inhabitants.

4. SAME—*when result of examination of books and documents may be given by a witness.* Where original evidence consists of numerous books, documents, papers and records which cannot be conveniently examined in open court and the fact to be proved is the general result of an examination of the whole collection, evidence as to such result may be given by any competent person who has examined the originals, provided the result is capable of being ascertained by calculation.

5. SAME—*when it is error to exclude warrants from the evidence.* Where the employees of a city treasurer's office, following the established custom prevailing in the office under previous administrations of other city treasurers, pay warrants in advance of their approval and allowance by the comptroller and city council, it is error, in a prosecution of the city treasurer for withholding city funds from his successor with criminal intent, to exclude from evidence such of the warrants as are not shown by direct evidence to have been paid to the persons named therein.

6. SAME—*when a motion to impound documents and permit an investigation should be allowed.* In the prosecution of a city treasurer for withholding funds from his successor with criminal intent, a motion to impound the books and documents in the possession of the prosecution and permit an examination thereof by the accused before the trial should be allowed, where it appears that such an examination is necessary to give the defendant time to investigate the charges and procure the attendance of the necessary witnesses.

7. SAME—*when motion for bill of particulars should be allowed.* While the allowance of a motion for a bill of particulars rests within the sound discretion of the court, yet it should be allowed where the charge is so general that the accused cannot properly prepare his defense without a more specific statement of the charge.

8. SAME—*rule as to allowing a private attorney to assist the State's attorney.* Whether private attorneys shall be allowed to assist the State's attorney in prosecuting a criminal case rests largely in the discretion of the court under the particular facts and circumstances of the case, but it is the duty of the court to prevent oppression of the accused and permit only such assistance as justice and fairness may require.

9. SAME—*when it is error to allow private attorney to conduct prosecution.* It is reversible error to allow a private attorney to practically conduct the prosecution of a city treasurer, where such attorney has been in the employ of the accused as his adviser during the administration of the accused, in matters closely related to and interwoven with the subject matter of the prosecution.

10. SAME—*an attorney in the case is not disqualified to testify.* The fact that a witness is employed as an attorney in the case does not preclude his testifying but only affects the question of the credibility of his testimony.

11. SAME—*a client may waive privilege against disclosures by attorney.* A client may waive the privilege against disclosure by his attorney of confidential matters, and does so when he voluntarily testifies thereto himself; but the waiver extends no further than the subject matter concerning which the client testifies.

12. SAME—*statute requiring demand to turn over funds should be reasonably construed.* While section 215 of the Criminal Code requires a demand upon a public officer to turn over funds to his successor, except under the circumstances coming within the proviso, yet the statute must be given a reasonable and practical construction as to what constitutes such demand.

13. SAME—*instruction should not authorize jury to treat testimony of accused different from that of other witnesses.* An instruction is objectionable which is so worded as to lead the jury to believe they may treat the testimony of the accused different from the testimony of other witnesses.

14. SAME—*when testimony of accused cannot be disregarded.* The right of the jury to disregard the uncorroborated testimony of the accused or any other witness is limited to cases where they believe, from the evidence, that the witness has willfully testified falsely to a matter material to the issues being tried.

15. SAME—*when instruction on the presumption of innocence should be qualified.* An instruction stating, in effect, that the rule which clothes every person with the presumption of innocence and imposes upon the State the burden of establishing his guilt beyond a reasonable doubt is not intended to aid anyone to escape who is, in fact, guilty of crime, should be qualified with the statement that such rule is a humane provision intended to prevent any innocent person from being unjustly punished.

WRIT OF ERROR to the City Court of East St. Louis; the Hon. BENJAMIN W. POPE, Judge, presiding.

D. J. SULLIVAN, and H. E. SCHAUMLEFFEL, for plaintiff in error.

P. J. LUCEY, Attorney General, CHARLES WEBB, State's Attorney, and GEORGE P. RAMSEY, (A. B. DAVIS, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

Plaintiff in error, Edward Gerold, was indicted at the September term, 1913, of the city court of East St. Louis for withholding, as city treasurer, the funds of said city, in violation of the provisions of section 215 of the Criminal Code. (Hurd's Stat. 1913, p. 848.) At a trial had at the March, 1914, term of that court the jury returned a verdict of guilty. At the May term judgment was rendered on said verdict and plaintiff in error sentenced to the penitentiary. This writ of error was then sued out.

In November, 1913, the plaintiff in error moved for a change of venue from the two judges of said city court, Vandeventer and Flannigan. The court denied the motion but called in Judge Benjamin Pope, of the city court of DuQuoin, Illinois, before whom the case was tried. It is urged by counsel for plaintiff in error that the trial of the case by Judge Pope was error; that the change of venue should have been granted under the affidavit from the two judges of said city court, and that that court was without

authority to call in Judge Pope. It was not urged below, and is not here, that Judge Pope was in any way prejudiced against plaintiff in error. Under the statute as to change of venue in civil cases, which is practically identical with the statute here invoked, this court has several times held that the party applying for a change of venue for prejudice of the judge ·obtained all the relief to which he was entitled when another judge,—one who had no interest in the proceeding,—was called in to try the case. (*Gregory Printing Co.* v. *DeVoney,* 257 Ill. 399, and cases cited.) Counsel concede that this is the rule laid down in civil cases, but insist that the statute should be differently construed as to criminal cases. We see no reason why any such distinction should be made in construing the same words in the criminal and civil statutes. The purpose in both cases is to secure a trial before a judge who is unprejudiced. If the object can be as well attained by not sending the case to another county as by doing so, the expense of the transfer should be avoided. Change of venue statutes should receive a reasonable construction,—one that will promote the ends of justice and carry out the purpose of the statute. *Chicago, Burlington and Quincy Railroad Co.* v. *Perkins,* 125 Ill. 127.

Counsel further argue, however, in this connection, that the refusal to send the case for trial to another county prejudiced plaintiff in error, as the people of East St. Louis were so aroused over the prosecution of this and other cases in which there appear to have been other indictments returned about the same time, that plaintiff in error could not receive a fair trial. The statute for change of venue on account of the prejudice of the judge was not enacted for the purpose of allowing a change of venue from the county on account of the prejudice of the inhabitants. There is another section of the statute on change of venue that covers that class of cases. We do not see how plain-

tiff in error was prejudiced by the calling in of Judge Pope to try this case.

The indictment consisted of five counts, each charging plaintiff in error, in substantially the same language, with the offense of withholding from Frank Keating, his successor in the office of city treasurer, money, coupons, bonds, bank checks, notes and other funds and securities belonging to the city of East St. Louis, of the value of $50,000. Before the trial of the case plaintiff in error presented a motion to the court, supported by an affidavit, setting out that it was wholly impossible for him to determine from said indictment in what particulars he was claimed to be in default and asking for a rule on the prosecution to file a bill of particulars. This motion was allowed, and shortly thereafter the State's attorney filed a bill of particulars, consisting of thirty-three counts or items. Thereupon the plaintiff in error presented to the court a motion for a rule on the prosecution to make the charges under count or item 30 more specific, on the ground that it was in such general terms as to afford but little, if any, information as to the nature of the charges contained therein. In the same motion plaintiff in error asked the court to impound the records and documents to be used on the trial so they could be inspected by him, urging in support of this motion that the State's attorney had taken into his possession many of the instruments, writings and public files belonging to the office of the city comptroller and the office of city treasurer, which would be relied on in the trial in support of the various counts in the bills of particulars; that he had refused to permit plaintiff in error to see them, and that in order to make a proper preparation of his defense it was necessary for him to see these various public documents; that he would not have the necessary time or opportunity during the actual trial of the case. The court overruled the motion and refused to require the State to make item 30 more specific, and refused to impound the

documents or to compel the State's attorney to allow plaintiff in error to examine them at that time.

After the jury was selected, plaintiff in error, by his attorneys, objected to the appearance of Thomas M. Webb as an attorney for the prosecution in the case, for the reason that for several years last past he had been the plaintiff in error's attorney and as such attorney had discussed in confidence the various items or charges involved in the indictment, setting out in some detail in what respect said Thomas M. Webb had advised with him on matters involved in the prosecution of this cause. The trial judge overruled this motion, giving as the reason that said Webb was an officer of the court and an attorney of experience and that he did not believe said attorney would do anything not becoming or befitting such officer. Thereafter Thomas M. Webb filed an affidavit giving his version of his relations, as an attorney, with plaintiff in error. It is most earnestly argued by counsel that the trial court erred in overruling these motions. We shall consider these questions later, as they can be better discussed after the facts have been stated.

At the time of the trial plaintiff in error was thirty-four years of age. He took office as treasurer of the city of East St. Louis in May, 1911, for the term of two years, serving as such treasurer for that term and giving bond as required by law. Prior to his election he had assisted his father in conducting a moving and storage business. His reputation appears to have been excellent. He had gone through the grammar grades of the public schools but had not attended high school. He had no knowledge whatever of book-keeping and knew nothing of the duties of the office of treasurer. After his election he placed in charge of the office an elderly gentleman, William H. Matlack, who had been in the treasurer's office in the same capacity during the administration of Neims, who was the predecessor of Gerold's predecessor, Holten. Matlack, from the

record, appears to have been quite familiar with the duties of the treasurer's office and the manner in which its business had been conducted. His competency or honesty was not questioned by either party at the trial. During the administration of the office under plaintiff in error, it seems to be conceded, the business was conducted under the same general system as it had been during the previous administrations, the same books being used and the same. safeguards adopted to protect the interests of the public. It would be more accurate, perhaps, to say the same lack of safeguards, for the book-keeping and management of the office under plaintiff in error's administration, as well as several previous administrations, were without question extremely defective. Near the expiration of the plaintiff in error's term of office an expert accountant, Harry G. Ambrose, from St. Louis, was employed by the city council of East St. Louis to examine and audit the books of the various offices, and such irregularities were discovered in the books of the treasurer's office that this indictment resulted. It seems to be conceded, also, that as a result of the same examination other indictments were returned by the same grand jury against other officials or employees of the city. During the term of office of plaintiff in error, and apparently for several years previous, the city of East St. Louis had been making a large number of local improvements, such as building sewers and paving streets and sidewalks, for most of which bonds, with interest coupons attached, had been issued for deferred payments. Many of these bonds and coupons were coming due during the two years plaintiff in error was in office. Claims in great numbers were also presented for payment every month to meet the expenses of the various departments of the municipality, including labor and contracts. The testimony shows that the moneys received by the city from various sources were frequently insufficient to meet its claims, and often certain claims were not paid for several months after being pre-

sented. It is obvious from the testimony that the city had never established a proper system of book-keeping as to the moneys received and paid out. The system of keeping books in all these various departments was so loose as to furnish little or no check by one department upon another, and it is apparent from all the testimony in this record that it was impracticable to check up with certainty or accuracy in any one of the departments what had been done by that department as to any given fund. No attempt was made by plaintiff in error or the city treasurers who had preceded him to keep the various funds separate, as the statute contemplates. The funds applying to the special improvements were kept with the general funds of the city, and frequently such funds seem to have been used indiscriminately. The proof shows that several years before this trial the city council of said city established the office of comptroller, giving him such power as is provided by statute for such official and also certain other duties imposed by ordinance. The statute provides that that officer shall have entire supervision of the finances of the city and the manner in which its money affairs shall be handled. Before plaintiff in error was elected to office, and during his term, under the system established, presumably by the direction of the comptroller's office, municipal bonds and coupons were prepared and issued by that office, and when presented for payment were audited, taken up and became files of that office. All claims for money were required to be presented to the comptroller and approved by him, as well as by the city council, before they were paid. If a claim had not been paid the warrant was issued to the one in whose favor the claim had been allowed. Claims were not allowed by the council, as a rule, oftener than once a month,—sometimes not for several months. Under a practice that had been in vogue for years with the municipal authorities, a creditor usually was not required to wait until his claim was passed upon by the council or the comp-

troller. If it appeared regular and meritorious on its face it would be paid by the treasurer's office when presented, and the treasurer would afterward get a warrant from the comptroller for the amount after the claim had been allowed and audited. On the receipt of such a warrant the treasurer's books would then be credited with the amount thereof. When coupon interest or principal bonds against the city fell due, it had been the practice of the city treasurer's office, with the sanction of all the other city departments, to take up these matured bonds and coupons as they were presented to the treasurer, paying cash therefor, before they had been audited by the comptroller or allowed by the council. These bonds or coupons would then be placed by the treasurer in a box, which is designated in the testimony as the "strong box," of that office. No record of any kind would be made in the treasurer's office of these transactions. From day to day, as the bonds were paid, they were placed in this strong box. Claims for labor or other running expenses were usually paid in a similar manner. When paid before allowed, an assignment by the claimant of the claim, in the form of an order on the treasurer for a warrant in favor of himself, would be taken by the city treasurer and placed in the strong box as a receipt for the money thus paid out. These various bonds, interest coupons and claims paid by the treasurer during the month and kept in the strong box might frequently amount to many thousands of dollars. Usually at the end of the month the treasurer would take this box and empty out its contents and make out statements of the claims, which were designated as vouchers. These vouchers, together with the instruments that had been paid by him, including bonds, coupons or claims, would be taken to the comptroller's office. If found correct on checking up they would be approved by the comptroller and taken before a committee of the city council, and if they were there approved would be endorsed by the chairman of the committee and pre-

sented to the council, and when allowed the city clerk would make an entry showing such allowance and thereafter the comptroller would issue a separate warrant on each of these vouchers. The city comptroller thereupon would deliver such warrants to the city treasurer. The treasurer's office would then make an entry upon its books showing these claims, bonds and coupons paid and take credit for them, which would be the first time that an entry was made in the books in the treasurer's office in a transaction of this kind. These claims were frequently paid by check signed by the city treasurer, but the evidence shows it was not the practice always to enter upon the stub of the check for what claim or in whose favor the check was drawn. The only protection that the treasurer had between the time he paid this claim, bond or coupon and the issuing of the warrant to him, was the instrument which he placed in his so-called "strong box." The evidence shows that under the administration of Frank Holten, the city treasurer who had preceded plaintiff in error, when bonds and interest coupons were paid they were not marked paid or in any other way showing they had been canceled. These bonds and coupons were payable to bearer and were therefore negotiable. When presented at the treasurer's office they were paid without question if they appeared regular on their face. The evidence discloses that at one time during the two years that plaintiff in error was treasurer a large number of these bonds and coupons issued in connection with various street improvements of the city were found on a table in a small room on the third floor of the city hall,—a room not in any way connected with the office of city treasurer or comptroller. When found they were covered with dust, indicating that they had been there for some time. They were not marked paid or canceled in any manner. The evidence tends to show that these bonds and coupons were actually paid during Holten's term of office. In amount they aggregated about $500,000. They were

not under lock and key and do not appear to have been in anyone's care. All bonds and coupons paid during plaintiff in error's administration were stamped with a perforating stamp at the time they were delivered to the comptroller. Some of these bonds and coupons presented by plaintiff in error to the comptroller, the prosecution insist in this case, had been previously paid by treasurer Holten but not at that time canceled or marked paid. One of the principal charges against plaintiff in error is that he wrongfully and with criminal intent took credit for paying these bonds and coupons the second time, after they had been taken up by his predecessor in office.

The first twenty-seven counts or items, except item 11, of the bill of particulars, consisted of charges that plaintiff in error had taken credit for paying bonds and coupons that had been paid previously by the city, upon the pretense that they had been paid during his administration, the same being done wrongfully and with criminal intent. These twenty-six counts or items each set forth a certain amount of money that it was charged had thus been pretended to have been paid out for coupons or bonds by Gerold during his two year term of office. The amounts charged in these various counts or items vary in amount from $25 to $6800, making a total of $18,520.60.

Counsel for plaintiff in error insist that the proof in the record did not justify his conviction under any one of these twenty-six counts. They also argue that the court improperly permitted the expert accountant employed by the city to give his conclusions showing that the coupons or bonds in each one of these counts, after having been paid by the former city treasurer, were shown by Gerold's books to have been paid by him when they were not, in fact, so paid by him, arguing that the expert gave in his testimony no proper basis for his conclusions before he was allowed to give them. The testimony of various city officials, including the comptroller and employees in his and the city

treasurer's office and others, is found in the record as to many of these items. We understand it is practically conceded by counsel for the State that as to most, if not all, of these items the proof would not be sufficient to justify the conviction of plaintiff in error without the testimony of the expert accountant, Ambrose. This expert, while on the witness stand, stated his method of reporting his conclusions from the books of the city that he had access to, as follows:

"A complete statement, so far as the history of every one of these improvements and as to the results of the accounts is concerned, was prepared from that examination from bonds, coupons, warrants and from entries in every cash book covering a period of five years, and every entry in every ledger covering that period was examined. Every coupon was applied to the vouchers that existed, and those for which the vouchers were missing were applied by finding the amounts of them corresponding to the amount required to balance certain vouchers. The bonds and coupons are now on file in the comptroller's office, and it would only have encumbered the evidence to try to show them. I may state that the audit of bonds and coupons was based on the total amount of bonds authorized, which also showed payments of coupons that were legitimately issued. We also took into account the cash account that showed balances of unissued bonds. At that time we knew the amounts of all bonds issued, the amounts unissued, the amounts redeemed and the amounts outstanding, and we had the same information in respect to coupons, and the result of our examination was that amounts had been paid in excess of the amounts issued and showed as redeemed."

The testimony shows that several of the books kept by the comptroller in which entries were made with reference to some of these bonds and interest coupons were lost or stolen out of the office before the time of this trial but does not tend to show who was responsible for these books

being lost or stolen. It seems to be assumed by counsel that they were stolen. Expert Ambrose was cross-examined at length as to why he testified that the bonds or coupons in each of the twenty-six counts or items had been illegally pretended to have been paid a second time by Gerold, and gave various and different reasons as to his conclusions under the different counts or items.

Where the originals consist of numerous documents, books, papers or records which cannot conveniently be examined in court and the fact to be proved is the general result of an examination of the whole collection, evidence may be given as to such result by any competent person who has examined the documents, provided the result is capable of being ascertained by calculation. (*Reinke* v. *Sanitary District*, 260 Ill. 380; *Welsh* v. *Shumway*, 232 id. 54; Jones on Evidence,—2d ed.—sec. 206; 2 Wigmore on Evidence, sec. 1230; 1 Greenleaf on Evidence,—Lewis' ed.—sec. 93; 2 Ency. of Evidence, 690; Underhill on Evidence, sec. 37; 17 Cyc. 511; *Hollingsworth* v. *State*, 111 Ind. 289; *Burton* v. *Driggs*, 20 Wall. 125.) In many instances any other method would cause a great loss of time and tend to confuse the jury. In a trial involving so many details and occupying as much time as the case under consideration, expert testimony as to what was shown by an examination of the books, accounts and records was the only mode of presenting an intelligent view of the case to the jury. The court, of course, might have required the production of the original books, so far as they were accessible. Counsel for the plaintiff in error do not object on the ground that they were not permitted to cross-examine expert Ambrose fully as to the basis of his conclusions. Their principal objection is that the expert should not have been permitted to testify to his conclusions. Without discussing at length the various objections raised by counsel for plaintiff in error as to the admissibility of Ambrose's testimony, we deem it sufficient to say that we

find no reversible error in the various rulings of the trial court on this particular subject. The weight of the testimony of this expert, as well as other testimony introduced by the State for the purpose of supporting the allegations under these twenty-six separate counts or items, was a question for the jury.

Count or item 11 of the bill of particulars charges the plaintiff in error with wrongfully withholding $1500 on account of the improvement of Missouri avenue, in said city. Some time in the early part of the year 1913, while Gerold was still city treasurer, a discrepancy was discovered in the treasurer's books by someone connected with that office. After various city officials were consulted,— among others plaintiff in error,—Saunders, an accountant and book-keeper, was employed to find the error. The discrepancy amounted to something over $1600. In making the investigation Saunders found in the comptroller's office three bonds of $500 each, numbered, respectively, 25, 42 and 62, for an improvement on Missouri avenue. These bonds were not marked canceled, but were found with certain other bonds on that improvement which the testimony shows had been paid and canceled under Gerold's administration of the treasurer's office. These three bonds accounted, if they had been paid during Gerold's term of office, for the greater portion of the discrepancy, and Saunders did not find from an examination of the records that they had been paid previous to the time Gerold was city treasurer. After consulting with various officials he concluded that these three bonds had been paid the same time as the others but that the treasurer's office had failed to cancel and take credit for them on the books. They were therefore then placed to the credit of treasurer Gerold's account. Afterward, expert Ambrose, in examining the books, found, as he testified, that these three bonds had been previously paid under treasurer Holten's administration. He talked with Gerold about it, and the latter stated

that he would look into the matter, and if he found Ambrose was correct he would assume the responsibility and refund the amount that had been credited to him. He did so refund it. Counsel for the plaintiff in error argue that because these bonds, which were introduced in evidence, showed that none of them were due until during Gerold's administration as city treasurer, expert Ambrose is certainly mistaken in saying they had been paid during Holten's administration, and that in any event it is clear that it was an error of book-keeping, if error at all, and not an intentional criminal violation by Gerold of the statute upon which this indictment was based. With this we agree. We do not think the evidence on this count of the bill of particulars was sufficient to sustain the conviction.

Under count or item 28 plaintiff in error is charged with withholding $1000 on the pretense that it was paid out in satisfaction of a judgment in the case of *Short* v. *City of East St. Louis,* (Short suing in the capacity of administrator,) which had been rendered in the circuit court of St. Clair county, Illinois. The judgment in question, as originally entered, was $5700. Payments were made by the city reducing the judgment to $4700. . During the spring of 1913, while Gerold was still city treasurer, the administrator in question procured a certified copy of the judgment from the circuit court showing the amount thereof and the amount that was still due thereon and took this transcript to the city comptroller's office, where that official prepared a voucher, to which the transcript was attached. The voucher and transcript could not be found at the time of the trial. When these documents were presented to the council they allowed the judgment for $5700 instead of for the balance then due, the total amount allowed being $5729.23 in place of $4729.23. A brother of the administrator took this claim, as so allowed, to the city treasurer's office to get the money, and there called the attention of Matlack, the chief clerk, to the fact that it had been

allowed for $1000 too much.   Apparently Matlack had not noticed that the higher amount was incorrect until his attention was called to it, and he or the administrator's brother changed the figure "5" to "4."   Matlack then gave the brother two checks, amounting to $4729.23, and took an assignment authorizing the comptroller to issue a warrant in favor of the treasurer for the money.   No entry was made of that part of this transaction at that time in the treasurer's book, and the assignment was taken in the usual form.   By some oversight Matlack failed to make any note of the fact that the claim was allowed for $1000 in excess of the correct amount.   Some time afterward the warrant for this claim was sent over by the comptroller's office to the treasurer's office, with other warrants, and the bookkeeper in the treasurer's office then gave the treasurer credit on the books for this warrant for $5729.23, which was $1000 more than should have been credited.   There is not the slightest evidence to show that plaintiff in error personally had, up to this time, any part in this transaction.   As we understand this record, he had no knowledge on this question until after this indictment was brought.   We are of the opinion that the State was not aware of this mistake until after the indictment was brought and the expert accountant had figured out the shortage on this point. The plaintiff in error himself testified that he knew nothing about it until two or three weeks before he was on the witness stand in this case, and that he had paid the amount over to his successor in office as soon thereafter as he could arrange with him to receive such payment.   We do not think the evidence in this record tends to show that plaintiff in error was guilty, under the statute, of criminally withholding this $1000.   All the transactions in the treasurer's office during his administration with reference to the Short judgment were looked after by employees in the office,—mainly by his chief assistant, Matlack.   Counsel for the People state in their brief and argument that there is

nothing in the record showing that Matlack was not a competent and honest man. If that statement be correct,—and we think it is,—we cannot see how it can be argued with any reason, as Matlack was responsible for the $1000 mistake as to the Short matter, that plaintiff in error is criminally liable, under the statute, for withholding that amount.

This conclusion renders it unnecessary for us to consider the other questions raised by counsel for plaintiff in error as to count or item 28 in the bill of particulars. No proof was offered under counts or items 29, 31, 32 and 33 of the bill of particulars.

The only item or count remaining for our consideration is number 30, under which it was charged that plaintiff in error withheld $25,000 from the city of East St. Louis. As heretofore stated, the court refused to require the State to make this item more specific. Near the close of Gerold's term of office as city treasurer there was made out by the employees in his office a report or statement showing various things with reference to the office, among others, that he had on hand cash amounting to $137,471.27. This report was substantially the only thing introduced in chief by the People to show that Gerold had kept back and refused to turn over $25,000 in money belonging to the city, as alleged in said count 30. On the day that Keating, the successor of Gerold, went into the office of city treasurer the plaintiff in error undertook to turn over this amount, $137,471.27, that he had belonging to the city. This money had all been kept in one fund by the treasurer, except the fund as to one special assessment improvement, amounting to $114,224.62. The evidence tends strongly to show that not only during Gerold's administration, but also during several preceding administrations in the city treasurer's office, the moneys as to these special assessment improvements and other funds had not been kept separate; that when plaintiff in error went into office Matlack and his assistants found the funds mixed in the same way. The evi-

dence shows, without contradiction, as we understand the record, that at the time Gerold went into the office he received from his predecessor, Holten, $120,000 in bulk, chiefly coupons and orders for warrants, the books not indicating the separate funds to which it should be applied. Gerold's successor, Keating, when he went into office, on the advice of his attorney, Dan McGlynn, refused to accept all the funds as they were offered to be turned over to him.   He accepted the $114,224.62 that was in a separate fund but refused to accept the balance of the $137,-471.27,—that is, $23,246.65.   Several meetings were held between Keating and his attorney, McGlynn, on one side, and Gerold and his attorney, Thomas M. Webb, on the other, to discuss this question of a separation of funds. Gerold, or his attorney for him, claimed that they could not separate this balance, as the funds had never been kept separate on the books and any separation would be purely arbitrary.   Keating, or his attorney for him, refused to accept such balance unless so divided.   Included in this balance, and claimed by plaintiff in error as a part of it, to be considered as cash, were orders for warrants on the city in his favor amounting to $6360.20.   These orders had been taken by employees in the city treasurer's office,— most, if not all, of them during the last month that Gerold was city treasurer,—when his office paid out money, from time to time, to various people by cash or check for labor and services, under contract or otherwise, and possibly in some instances for materials furnished the city. The evidence shows that some of these claims had been presented by the comptroller to the city council before Gerold was out of office and the remainder afterward, and that all of them were allowed by the city council as just claims. Warrants were issued by the comptroller to the treasurer for all of these claims, some immediately before and some immediately after plaintiff in error went out of office, and it appears they would have been paid had there been suf-

265 – 30

ficient money on hand at the time to pay them. Afterward plaintiff in error was asked to return the warrants and told that the new city administration, through its comptroller, would issue in their place anticipation warrants against the appropriation of taxes that had then been made. This was done and anticipation warrants were issued, but before they were delivered to plaintiff in error the matter was being investigated by the grand jury, and these anticipation warrants remained in the comptroller's office and were shown to be there at the time of the trial.

We find nothing in the record to indicate that the new treasurer, Keating, or his attorney, made serious objection to receiving this sum of $6360.20 in orders for warrants as cash at the time of the various conferences. The principal dispute was that the balance then on hand of $23,-246.65 (including said $6360.20 in orders for warrants) was not separated so that it could be paid over in separate funds. Some time after he was out of office, before and during the time of the trial, as his attention was called to these three matters, plaintiff in error paid over to the fund that he held as city treasurer, the $1000 incorrectly credited to him in the Short judgment matter, the $1500 plus the interest of $275 (or $1775 in all) for the three Missouri avenue improvement bonds, and $800 that had been appropriated by the city council while Gerold was in office as a part of an allowance to the city aldermen to attend a meeting of the municipal assembly at Buffalo. The amount allowed each alderman for expenses was $200, and as four of them did not attend they did not draw this money. This $800, through an error of book-keeping, was not shown as still belonging to the funds of the city in said city treasurer's report that we have referred to. As soon as plaintiff in error's attention was called to this he set that sum aside as belonging to the city treasurer. These three last named sums, amounting to $3575, when added to the balance heretofore referred to of $23,246.65, left a balance in Gerold's

hands of $26,821.65, which he freely concedes belongs to the city. In this last named amount, of course, was included the $6360.20 which he claimed should be considered as cash and was so considered in making up his final report. Including these added amounts, the actual cash, $20,461.45, that he held was deposited in the bank. During the trial of this cause the new city treasurer, on the suggestion of one of his employees and apparently with the sanction of his attorney, divided arbitrarily this balance into separate funds and accepted from the plaintiff in error, in part payment of such balance, the $20,461.45 cash held by him for that purpose, leaving in the hands of the plaintiff in error $6360.20 in orders for warrants. This last named amount, therefore, was the only amount that was submitted to the jury in support of item or count 30 of the bill of particulars, which item set forth that plaintiff in error was keeping back $25,000 of money belonging to the city, and counsel for the State concede that this is the only part of the $25,-000 that there is any proof in the record to support.

After these orders for warrants had been introduced in evidence, showing the amount of money paid out by the treasurer's office for which plaintiff in error claimed he was entitled to credit, on a motion made by the prosecution the court announced that it would exclude all these orders, excepting those where plaintiff in error could prove that the money had been actually paid to the parties named in the orders. The record shows that plaintiff in error did make proof as to nearly all of the orders, which varied all the way from $2 to over $1000. As to some, if not the great majority, of these claims we think the proof showed clearly that the money had been paid to the persons who signed the orders, and, so far as the record discloses, the payments were legitimate. The court, however, held, as we understand, that as to four of these orders, amounting, respectively, to $87, $84.50, $64 and $109.95, (two of the four being signed by one person and the other two by two

different persons,) as there was no proof presented to the court that these men had actually received the money, he would not allow those four amounts to be considered by the jury as equivalent to cash on hand, as shown by Gerold's final report when his term as city treasurer expired. The State, in rebuttal, also introduced evidence which it is claimed tended to show that some of these other orders for warrants were not based on actual or legitimate service furnished to the city by the parties in question.

The evidence shows, without contradiction, that during the entire term of plaintiff in error as city treasurer, as well as during the administration of several previous city treasurers, the custom had prevailed of paying cash for orders for warrants in a manner similar to that which the testimony shows the treasurer's office followed in paying money for these orders for warrants, amounting to $6360.20 during the last few weeks of plaintiff in error's term as city treasurer; that until the warrants were cashed the city treasurer's office, during all those years, had treated the said orders for warrants as cash in the conduct of the office. In view of the testimony in this record the court should not have ruled, as it did, that the plaintiff in error should not be entitled to credit as the equivalent of cash for any of these vouchers or orders for warrants that had been assigned to him, unless it could positively be proven that the money had actually been paid to the party named in the order. The evidence shows, without contradiction, that plaintiff in error himself attended to very little of the business of the office; that in most, if not all, of these cases the money was paid by his chief clerk, Matlack, or some other employee in the office. He himself does not remember that he paid the money for any of these vouchers or orders for warrants included in the $6360.20, and there is no proof in the record that he did. The court should have permitted the testimony of plaintiff in error to remain before the jury, to be considered by them and be

given such weight as they thought proper, in the light of all the testimony in the record. If the State could introduce evidence tending to show that any of these vouchers or orders for warrants had been forged, and that plaintiff in error, as city treasurer, had not actually paid the money for any of them, such evidence would have been proper to be submitted to the jury for their consideration on that subject, but evidence that only tended to prove that while an employee or contractor had done the work, through collusion with some city official he had not done good work, should not have been admitted to prove plaintiff in error guilty, under the statute, if he actually paid, as treasurer, to the persons who did the work, money for such vouchers or orders. The trial judge evidently understood this to be the law, as he gave instructions to the jury to that effect. If the only question involved in this record were the rulings as to the admission or exclusion of evidence with reference to the orders for warrants for the $6360.20, our conclusion would be that no serious error was committed by the trial court in this regard, except as to the ruling in excluding the vouchers or orders for warrants where it was not proved by direct evidence that the money had been actually received by the parties therein named.

Some other questions are closely involved with the question just considered, in deciding whether or not there is any proof justifying the jury in finding plaintiff in error guilty under count 30. One of these is whether the court should have impounded the public documents that were held by the State's attorney and should have granted the motion of plaintiff in error to permit him and his counsel to examine such documents before they were actually introduced in evidence. That motion stated that the reason why he wished this was because the accounts upon which these charges were made were complicated and would require investigation, and that the plaintiff in error would not have an opportunity of properly investigating all these matters

if he had to wait until they were introduced in evidence. It is stated by counsel for plaintiff in error,—and the evidence in the record tends to show that it is true as to some, at least, of these orders for warrants included in the disputed amount,—that the persons who signed the orders or made the assignments to the plaintiff in error could not be found because of lack of time. Had the plaintiff in error had an opportunity of examining, under proper conditions, these various documents, it is possible that he could have obtained positive evidence as to the payment of the money to the proper persons. The whole theory of our law as to the trial of one accused of crime is to give him an opportunity to know the charges against him, so that he can make proper investigation and preparation for the trial. We see no reason why the motion of plaintiff in error on this point should not have been granted by the trial court.

Very closely related to this last question is the one whether the court committed error in not requiring the State to specify more particularly under said count 30 upon what charges that count was based. The count reads:

"The withholding of twenty-five thousand ($25,000) dollars of the money of the city of East St. Louis, which the defendant received as treasurer of the said city during his term of office, commencing May 5, 1911, and ending May 5, 1913, and the said sum of twenty-five thousand ($25,000) dollars is separate and distinct from each and all of the items above specified and is composed of various items or sums, the origin and character of which is unknown to the People, the plaintiff in said cause."

It would be difficult to imagine a charge more general in its nature. It is only limited in the respect that it says this amount is distinct from each and every other item specified in the counts. It requires no argument to show that a conviction under this count would be impossible if the proof was as general as the count. The record shows conclusively that the State knew, at the time the motion

was made to make this count more specific, that they were relying at least upon the fact that the report heretofore referred to showed that plaintiff in error had on hand, in cash, $137,471.27 and that he had only turned over $114,-224.62. The prosecuting officer must have known that the orders or vouchers for $6360.20 constituted the chief part of this charge, for it is clear from this record that the newly elected city treasurer, and his attorney, Dan McGlynn, and also Thomas M. Webb, who was assisting in the prosecution at the time this motion was made, knew that plaintiff in error had on hand, in cash, all of the balance except that made up of orders for warrants, subject to be turned over to the new city treasurer, and that the dispute about that amount was only that it was not divided into separate funds. That information could readily have been included, thus giving a far more specific statement as to the basis of this count than was furnished by the wording as it stood. The requiring of a bill of particulars is within the sound discretion of the court. It is only required when the defendant cannot properly prepare his defense without such bill. (*Kelly* v. *People,* 192 Ill. 119; *People* v. *Nall,* 242 id. 284; *People* v. *Poindexter,* 243 id. 68.) On this record we can reach no other conclusion than that on this count, with the indefinite wording that it contained, plaintiff in error was not given a fair and reasonable opportunity to prepare for his trial. (See *Goodhue* v. *People,* 94 Ill. 37.) The rulings of the court in refusing to allow the motion of the plaintiff in error to make the charges in said count 30 more specific, and in not impounding the public documents in the hands of the State's attorney and permitting plaintiff in error and his counsel to examine them under proper restrictions, constituted reversible error.

Counsel for plaintiff in error further urge in this connection that the court improperly permitted Thomas M. Webb to appear as counsel for the People in this case when

he had previously acted as an attorney for plaintiff in error in matters which afterward formed the basis of this indictment and the prosecution thereunder. At the opening of the trial of this cause in support of his motion the plaintiff in error filed his affidavit, in which he set out, among other things, that said Webb had been for several years his attorney and had discussed in confidence with him the various items or charges involved in the indictment in this case; that since the indictment Webb had informed him he was going to assist in the prosecution of other indictments but would not assist in this against plaintiff in error; that Webb thereby succeeded in having affiant discuss with him the various items or charges involved herein, promising affiant that he would give him substantial advice and assistance in the trial of this case but that he could not act as attorney for affiant in the trial because his brother, Charles Webb, was State's attorney; that said Webb was at the time of the motion representing affiant in a civil suit on his bond now pending in the circuit court of that county, which covered many of the items involved in the bill of particulars herein; that those items had been discussed between them, both before and since the finding of this indictment; that affiant relied on Webb's promise that he would not appear for the prosecution; that in discussing the turning over of the office to his successor in office said Webb had acted as affiant's adviser and attorney, and prepared a resolution, which was passed by the city council, requesting Keating, plaintiff in error's successor, to accept said money as tendered without its being apportioned in funds; that the said Webb had continued to advise affiant that there was nothing affiant could do but to withhold the payment of the money until his successor in office would accept it; that at a former term of the court, when a bill of particulars was demanded of the State's attorney in this and other cases, said Webb made an argument against the motion, and when plaintiff in error

asked him why he did so, Webb stated that it was an immaterial matter and that the question involved applied to other bills of particulars in other cases and that he (Webb) would not assist in the prosecution of this case, and that said Webb afterward continued to advise and discuss with affiant as his confidential adviser and attorney.

This affidavit was sworn to March 7, 1914. The next day said Thomas M. Webb swore to an affidavit which was filed herein, and in which he stated that for some years prior to this indictment he had represented the Gerold Storage, Packing and Moving Company and plaintiff in error in various civil matters; that before and after the indictment affiant told Gerold that he had promised his brother, Charles Webb, State's attorney of the said county, that he would not accept the defense of any person charged with crime during said brother's term of office; that it was not true that he had discussed in confidence with said Gerold the items or charges involved in this indictment; that prior to said indictment he prepared for Gerold a resolution, the gist of which was that it was the sense and wish of the city council that Keating, Gerold's successor in office, accept from him a certain statement of the condition of the various funds then in his hands as ex-treasurer and that said Keating receipt for such funds received; that he had no recollection of appearing before the city council with reference to said resolution; that since the indictment he had not had anything to do with that resolution or any matter pertaining thereto; that prior to this indictment he had appeared, together with attorney Dan McGlynn, for Gerold in an action of debt brought by the city of East St. Louis against Gerold and had filed a certain plea therein; that this suit involved a certain amount of money which the city claimed that Gerold retained over and above his legal commissions as collector of taxes, and that the question of the criminal liability of Gerold was never discussed between them; that since the filing of said plea in said suit

affiant had not advised with Gerold, except on one occasion as to the filing of certain special pleas; that at no time did he ever discuss the matters involved in said suit from a criminal standpoint; that it was not true that he told Gerold that he would not assist in the prosecution; that, on the contrary, he told Gerold he would appear for the prosecution, and that Gerold should not disclose or discuss any matter pertaining to his defense, and that it was not true that he had continued to advise with Gerold concerning the withholding of funds from his successor in office; that Gerold stated that it would be impossible for him to render a statement to his successor showing, in detail, the particular funds, and thereupon affiant advised Gerold that in such case it would be best to procure the acceptance by his successor of whatever money he had in his hands belonging to the city, and that all such advice was with reference to Gerold's civil liability and had no reference to any criminal liability; that it was not true that he has discussed with Gerold the items involved in the bill of particulars filed in this cause; that affiant did not learn from said Gerold any fact or facts in a confidential or any other way that would hinder or delay Gerold's defense or aid the prosecution; that it was not true that he promised Gerold that he would give him substantial advice and assistance in the trial of this case.

Plaintiff in error in his defense testified at some length on this question: He re-affirmed on the witness stand the chief facts set forth in his affidavit just referred to. He testified, also, that said Thomas M. Webb was his confidential adviser and attorney when he was elected to office and arranged the adjustment between him and his predecessor when the plaintiff in error took over, as treasurer, the cash from his predecessor, including over $120,000 of orders for which his predecessor had paid cash but had not received warrants or credit on the books of the treasurer; that these orders or warrants were of the same character

as those for the $6360.20 involved in this proceeding; that
when his office was being investigated by the expert, Am-
brose, Webb was plaintiff in error's adviser; that when it
came to a settlement between plaintiff in error and his suc-
cessor, said Webb advised plaintiff in error that his cash
balance could not be divided and distributed into funds as
his successor wished to have it, and told the successor's at-
torney that the money could not be so distributed; that said
Webb was familiar with each of these warrants that the
plaintiff in error had at the close of his administration, and
that they had talked over these matters together with these
orders on the table before them.   In rebuttal for the State,
Thomas M. Webb took the witness stand and testified sub-
stantially as set forth in his affidavit above referred to, tes-
tifying, among other things, that he had practiced law for
over twenty years and had known plaintiff in error about
ten years; denied that he was plaintiff in error's attorney
when his predecessor, Holten, turned over his office, and
that through his (Webb's) advice the plaintiff in error had
accepted from said Holten $120,000 in orders or coupons;
testified that he never had any connection with the set-
tlement between plaintiff in error and Holten and knew
nothing about it; that he never heard anything about these
vouchers for warrants until this trial began and never saw
the said vouchers before they were brought into court in
this case; that when he, as attorney for plaintiff in error,
met with Keating and his attorney, Dan McGlynn, and
talked about turning over the money then held by plaintiff
in error, he (Webb) said to Keating and McGlynn that
he thought this money could be separated into the various
funds, and that thereafter, in discussing it when they were
alone together, plaintiff in error told him that the money
could not be separated into the various funds, and that he
would not turn over any of the cash to his successor until
Keating agreed to accept these orders as cash.   McGlynn
and Keating also testified in the case.   It is apparent from

McGlynn's testimony, as well as that of plaintiff in error, that during these conferences McGlynn and Webb did a large part of the talking. Webb's testimony tends to show that plaintiff in error did as much talking as he (Webb). Keating testified that at their first conference Webb stated that he thought the money could be separated into the various funds. Webb, while on the witness stand, stated that he was only advising plaintiff in error during these conferences about turning over the cash and getting it accepted, as to the legal phases of the subject, and that the question of criminal responsibility of plaintiff in error was not considered or discussed in any manner.

When Thomas M. Webb took the witness stand counsel for plaintiff in error objected to his testifying unless he withdrew from the case as an attorney. The court refused to allow the motion, stating that he had no control over the matter. The record shows that Webb was practically in entire charge of the active prosecution of this case and all important witnesses appear to have been examined by him, except that when on the witness stand in rebuttal he was examined by another assistant. He also appears to have cross-examined practically all the witnesses for the defense. His brother, the State's attorney, so far as the record discloses, took little part in the trial below. No reason is given in the briefs, and we find none in the record, showing why the State's attorney himself did not prosecute this case or why Webb was employed to take charge of the prosecution. We can readily understand why the State's attorney of a large county such as St. Clair might not be able to give the necessary time to the preparation and the trial of such a complicated case as this, but we know of no reason why some member of the bar should not have been employed to assist who had not been the attorney and confidential adviser of plaintiff in error on any question that may be directly or indirectly involved in this hearing. This court has held that whether counsel should be em-

ployed to assist the State's attorney in the prosecution of
a case rests largely in the sound discretion of the court, to
be decided according to the special facts and situation in
each case; that it is the duty of the court to prevent op-
pression of the accused and permit only such assistance as
justice and fairness may require. *Hayner* v. *People,* 213
Ill. 142; *People* v. *Blevins,* 251 id. 381; *People* v. *Gray,*
251 id. 431; *People* v. *Donaldson,* 255 id. 19; see, also,
*State* v. *Bartley,* 24 L. R. A. (N. S.) 564, and cases cited
in note.

So far as we are advised this court has never been
called upon in any criminal case to pass on a question simi-
lar to the one here involved, but the identical question has
been passed upon many times in other jurisdictions, and in
this and other courts the principle involved has received
careful consideration. The rule has long been firmly estab-
lished that an attorney cannot represent conflicting inter-
ests or undertake to discharge inconsistent duties. When
he has once been retained and received the confidence of a
client he cannot enter the service of those whose interests
are adverse to that of his client or take employment in mat-
ters so closely related to those of his client or former client
as in effect to be a part thereof. (Weeks on Attorneys,—
2d ed.—secs. 120, 271; 1 Thornton on Attorneys, sec. 174.)
This rule is a rigid one, designed not alone to prevent the
dishonest practitioner from fraudulent conduct, but as well
to preclude the honest practitioner from putting himself in
a position where he may be required to choose between
conflicting duties. He should undertake no adverse employ-
ment, no matter how honest may be his motives and inten-
tions. (*Strong* v. *International Investment Union,* 183 Ill.
97.) He owes to his client fidelity, secrecy, diligence and
skill and cannot take a reward from the other side. He is
not, as a general rule, allowed to divulge information and
secrets imparted to him by his client or acquired during
their professional relation unless authorized to do so by the

client himself. (*Hatch* v. *Fogerty,* 40 How. Pr. 492.)   It is the glory of the legal profession that its fidelity to its clients can be depended upon; that a man may safely go to a lawyer and converse with him upon his rights in litigation with absolute assurance that that lawyer's tongue is tied from ever discussing it. (*United States* v. *Costen,* 38 Fed. Rep. 24.)   This rule has been so strictly enforced that it has been held that an attorney, on terminating his employment, cannot thereafter act as counsel against his client in the same general matter, even though while acting for his former client he acquired no knowledge which could operate to the client's disadvantage in the subsequent adverse employment. (*Pierce* v. *Palmer,* Ann. Cas. 1912*b*, (R. I.) 181, and cases cited in note.)   If this is the rule in civil cases the law will not be less strict in criminal proceedings, especially as to the duty in this regard resting upon counsel for the State.   Such an officer is acting in a *quasi*-judicial capacity, and he and those associated with him should represent public justice and stand indifferent as between the accused and any private interest.   It is as much the duty of prosecuting attorneys to see that a person on trial is not deprived of any of his statutory or legal rights as it is to prosecute him for the crime with which he may be charged. (*State* v. *Osborne,* 20 Ann. Cas. [Ore.] 627.)   The canons of ethics of the American Bar Association and various State associations in this country are in accord on this subject with the rule just stated. An attorney cannot be permitted to assist in the prosecution of a criminal case if by reason of his professional relations with the accused he has acquired a knowledge of the facts upon which the prosecution is predicated or which are closely interwoven therewith. (*Wilson* v. *State,* 16 Ind. 392; *Commonwealth* v. *Gibbs,* 4 Gray, 146.)   The members of the profession must have the fullest confidence of their clients.   If it may be abused the profession will suffer by the loss of the confidence of the people.   The good

of the profession, as well as the safety of clients, demands the recognition and enforcement of these rules. (*State* v. *Halstead,* 73 Iowa, 376.) It is unnecessary that the prosecuting attorney be guilty of an attempt to betray confidence; it is enough if it places him in a position which leaves him open to such charge; and this disqualification may arise by reason of services rendered by him in a civil case as well as in a criminal case. (*State* v. *Rocker,* 130 Iowa, 239; 2 Thornton on Attorneys, secs. 693, 700.) The administration of the law should be free from all temptation and suspicion, so far as human agencies are capable of accomplishing that object, and public policy strongly demands that one who has been employed on one side should not be permitted to appear on the other side. It is not sufficient to say that the law will not permit him to disclose any fact which may have been communicated to him. "If he *knows* the vulnerable points in the case \* \* \* there are many ways by which those points might be made available \* \* \* besides disclosing them as a witness." (*Gaulden* v. *State,* 11 Ga. 47.) "The case might easily be put that a most honest man so changing his situation might communicate a fact appearing to him to have no connection with the case" and yet which might turn out to be the vital point therein. (*Cholmondeley* v. *Clinton,* 19 Ves. Jr. 260.) The authorities last cited also state that if an attorney knows anything prejudicial to a former client he ought not to accept employment against him where such prejudicial information can be used against him. Of course, it is no ground for preventing counsel from accepting employment in a case merely that he has knowledge of the facts involved therein. (*Commonwealth* v. *King,* 74 Mass. 501.) It is the obtaining of this knowledge from his client as his confidential adviser and attorney that precludes him from accepting such employment.

"Lest any temptation should exist to violate professional confidence or to make any improper use of the in-

formation which an attorney has acquired confidentially, as well as upon principles of public policy, he will not be permitted to be concerned on one side of the proceedings in which he was originally in a different interest,  *  *  * and though discharged many years ago and feeling himself free to swear that he had forgotten the nature and purport of the communications he had received from the former client and that they were not confidential, for the court can not investigate the plus or the minus of the confidence reposed in him without an absolute disclosure of the facts nor can it calculate how much of these confidential communications are still in the recollection of the attorney, but the mere circumstance of a retainer sufficiently implies the fact of confidential disclosure to whatever extent having been made." 1 Ferguson's Ir. Pr. 36, 37; *In re Cowdery,* 58 Am. Rep. 545; *Hatch* v. *Fogerty, supra.*

Considering only the affidavit and testimony of attorney Webb himself, the conclusion is inevitable that he was employed by Gerold in a matter that was very closely interwoven with and related to the same subject matter that formed a basis for this prosecution, if, indeed, it was not the same identical matter, and that this rule must be invoked against his employment in this cause. No matter if his intentions were of the best, he placed himself in a position to be open to the charge of betraying the professional confidence of his client. The law will not permit this. The trial court should have sustained the motion and refused to permit Webb to assist in the prosecution of this cause.

Counsel for plaintiff in error objected to attorney Webb testifying on the ground that he was disqualified because he was an attorney in the cause. This fact did not prevent him from testifying but only affected the weight that should be given to his testimony. Our views on the propriety of an attorney testifying under such circumstances have been repeatedly stated. *Wilkinson* v. *People,* 226 Ill.

135; *Fitzgerald* v. *Allen*, 240 id. 80; *Wetzel* v. *Firebaugh*, 251 id. 190; *Bailey* v. *Beall*, 251 id. 577, and cases cited.

Counsel in this court have raised an objection to attorney Webb testifying as to confidential communications which he had received from his client, Gerold. This objection does not appear to have been raised in the court below and therefore we need not consider it. Had it been, Gerold waived the point as to most, if not all, the testimony of Webb. While the general rule is that all confidential communications between attorney and client made because of their relationship and concerning the subject matter of the attorney's employment are privileged from disclosure, and counsel are not at liberty, even if they wish, to testify concerning them, (*People* v. *Barker*, 56 Ill. 299; *Thorp* v. *Goewey*, 85 id. 611; 1 Greenleaf on Evidence, (Lewis' ed.) sec. 237; *State* v. *Douglass*, 20 W. Va. 770; *Spaulding* v. *State*, 61 Neb. 289; *State* v. *Snowden*, 23 Utah, 318;) yet the client himself can waive such privilege, and does do so where he voluntarily testifies himself to confidential communications between himself and his attorney. Such waiver, however, extends no further than the subject matter concerning which testimony had been given by the client. 1 Thornton on Attorneys, secs. 92, 130, and cited cases; *Knight* v. *People*, 192 Ill. 170.

Counsel for plaintiff in error argue that section 215 of the Criminal Code, upon which this indictment is based, requires that a demand should be made of Gerold by his successor in office for the money in his hands as city treasurer after his term of office had expired, and that no such demand was made. Section 215, after stating the officials and the funds to which it refers, provides that (when the amount is over $100) if any such officer "shall fail or refuse to pay or deliver over the same when required by law, or demand is made by his successor in office or trust, or the officer or person to whom the same should be paid or delivered over, or his agent or attorney, authorized in writ-

265 – 31

ing, he shall be imprisoned in the penitentiary not less than one nor more than ten years: *Provided,* such demand need not be made when, from the absence or fault of the offender, the same cannot conveniently be made," etc. Whatever argument there might be as to the proper construction of this statute on the question of demand has been answered by the decisions of this court in *Dreyer* v. *People,* 176 Ill. 590, and *Town of Cicero* v. *Hall,* 240 id. 160. Under the construction there put upon this statute a demand is required, except as stated in the proviso just quoted. The statute should be given a reasonable and practical construction as to what amounts to a demand. So construed, no other conclusion can be reached than that by the various conferences between Gerold and his successor, Keating, and their respective attorneys, it was clearly understood a demand was being made, and that the money was not turned over, not because there was no formal demand but because they could not agree as to the separation of the funds.

Counsel for plaintiff in error further insist on this same point, that this being the proper construction of the statute, the court erred in giving the first instruction for the People, which reads:

"The court instructs the jury that if you believe, from the evidence, beyond a reasonable doubt, that the defendant, as treasurer of the city of East St. Louis, collected and received certain moneys of the city of East St. Louis in excess of $100, and that he failed and refused, when required by law or on demand by his successor in office, to pay and deliver over said amount to his successor in said office, in manner and form as charged in the indictment, then you should find the defendant guilty."

The argument is, that this instruction, by stating that plaintiff in error "failed and refused, when required by law *or* on demand by his successor in office," etc., would lead the jury to think that no demand was necessary. Counsel for the State insist that the language objected to is a

quotation from said section 215 of the Criminal Code and therefore it is not erroneous. This instruction, considered alone, might have misled the jury in view of the evidence in the record that a part of the money which the indictment charged plaintiff in error with not turning over was withheld because of the dispute as to separating it into funds. The instruction should not have been given. The sixth instruction was faulty in its wording for substantially the same reasons as the first instruction.

Counsel for plaintiff in error further argue that instruction 3 given for the People is erroneous. That instruction reads:

"The court further instructs you in this connection that the law permits persons charged with crime to testify in their own behalf, and that when the defendant testified in this case he differs from other witnesses only in the fact that he, the defendant, is charged and being tried for crime, which you may take into consideration in passing upon his credibility, but in every other respect his testimony must be treated the same as that of other witnesses who have testified in this case and is to be subjected to the same tests as are legally applicable to other witnesses; and in determining the degree of credibility that shall be given to his testimony you may, in addition to his interest in the result of the case, take into consideration the reasonableness of the story he tells and his demeanor on the witness stand while testifying; and you may also take into consideration the fact, if you find, from the evidence before you, that such is the fact, that he has been contradicted as to matters material to the issue in this case by other witnesses who are credible and who have testified before you, and if, after candidly and impartially considering all of the defendant's evidence in connection with all the other evidence in the case, and after applying all these tests, you then deem it unworthy of belief, you may then disregard it, except so far as it is corroborated by other credible evidence given be-

fore you or circumstances in evidence, but you should not disregard it merely because he is the defendant."

The wording as to the first part of this instruction is objectionable, in that it might lead the jury to treat the testimony of plaintiff in error different from that of other witnesses and therefore be subject to the criticisms of instructions of that character set forth in *Hellyer* v. *People,* 186 Ill. 550, *People* v. *Arnold,* 248 id. 169, and *People* v. *Barkas,* 255 id. 516. The wording of the instruction, approved by this court in *Hirschman* v. *People,* 101 Ill. 568, *Rider* v. *People,* 110 id. 11, and several other decisions, can by no possibility mislead the jury on this point. There is, however, a more serious objection to the instruction. After reciting the various things to be taken into consideration by the jury in passing upon plaintiff in error's testimony, it continues, "and after applying all these tests you then deem it unworthy of belief you may then disregard it, except," etc. For what reasons shall his testimony be deemed "unworthy of belief?" It has been repeatedly stated by this court that the testimony of plaintiff in error or any other witness cannot be disregarded unless he has knowingly and willfully testified falsely on material matters. (*Chicago City Railway Co.* v. *Ryan,* 225 Ill. 287; *Godair* v. *Ham Nat. Bank,* 225 id. 572, and cases cited; *Miller* v. *People,* 229 id. 376; *People* v. *Scarbak,* 245 id. 435; *People* v. *Tielke,* 259 id. 88.) Under the reasoning of these authorities the giving of this instruction was clearly error, as no such condition or qualification is found therein.

The twelfth instruction given for the People reads:

"The court instructs you, as a matter of law, that the rule which clothes every person accused of crime with the presumption of innocence and imposes upon the State the burden of establishing his guilt beyond a reasonable doubt is not intended to aid anyone who is, in fact, guilty of crime to escape."

Plaintiff in error insists that it is incorrect because in its brief form the latter part of the instruction was calculated to minimize and disparage the principle laid down in the first part.   Counsel for the People state that this instruction has been approved in *People* v. *Scarbak, supra,* and other decisions of this court.   In this counsel are mistaken.   In *People* v. *Scarbak, supra,* and *Spies* v. *People,* 122 Ill. 1, an instruction in identical language with the first part of this instruction was given, but in those cases it concluded with the added clause, "but is a humane provision of the law, intended, so far as human agencies can, to prevent any innocent person being unjustly punished." The instruction should have contained the clause just quoted.   While the giving of this instruction in this form in this case might not be reversible error, the instruction should have been given, if at all, in the form heretofore sanctioned by this court.

Questions have been raised as to the giving and refusing of certain other instructions.   What we have already said in this opinion disposes, we think, of all such questions. We find no such serious error in other instructions as to require our consideration.

Counsel for plaintiff in error further contend that error was committed because the bailiff in charge of the jury was not sworn at the close of the case, when the jury retired in his charge to consider the verdict; also in permitting the jury, during the trial, to see picture shows, (both parties, as we understand the record, consenting at the time,) and that the court should have granted a new trial on the showing made that two of the jurors were not fair and impartial, as in their answers they made untruthful statements as to their competency.   These questions, and also others with reference to the proper custody of the jury, do not require our consideration, as the cause must be reversed for other reasons and these questions are not liable to arise in another trial.

Counsel for plaintiff in error further argue that the evidence in support of the twenty-six counts of the bill of particulars 'which have not been considered and passed upon separately in this opinion does not justify a verdict under any of them. Counsel for the State just as earnestly insist that the evidence clearly shows the guilt of plaintiff in error under each of these counts. As this case must be tried again we shall not express an opinion or comment on the evidence further than we have already done.

For the reasons stated the judgment of the city court of East St. Louis must be reversed and the cause remanded.

*Reversed and remanded.*