THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. THOMAS WALSH et al. Plaintiffs in Error.

*Opinion filed June 16, 1926—Rehearing denied October 6, 1926.*

1. CRIMINAL LAW—*what is a substantial compliance with Jury Commissioners act in counties of 250,000.* The Jury Commissioners act of 1887, as amended in 1897 and 1919, for selecting jurors in counties of 250,000 population, is substantially complied with in Cook county by the commissioners taking the poll or registration list of voters outside the city of Chicago, mailing questionnaires every year to a portion of the persons listed in the city directory, exhausting the same every four years, and from the answers received selecting and placing in the jury box the names of persons qualified for jury service, provided that at least 15,000 names are kept in the jury box at all times; and a grand jury selected from this list as provided by statute will be regarded as properly drawn in the absence of a showing of prejudice.

2. SAME—*when conviction of conspiracy may be sustained notwithstanding variance.* Defendants charged with conspiracy to extort money from the "Portage Theatre Company" by inducing employees to strike cannot be convicted under evidence showing that the money was taken from the "Portage Theatre Building Corporation," but where other counts and other portions of the same count charge the same conspiracy against other parties properly named, and the evidence shows all the defendants guilty under some count or portion thereof, a conviction of all the defendants may be sustained although the court has erroneously instructed the jury to disregard any variance as to names.

3. SAME—*when Statute of Limitations begins to run against prosecution for conspiracy.* In a prosecution for conspiracy the Statute of Limitations does not begin to run from the time the conspiracy was entered into but from the commission of the last overt act in furtherance of the object of the conspiracy.

4. SAME—*not essential that all conspirators named be proven guilty.* Under an indictment charging several persons with conspiracy the proof need not necessarily establish the guilt of all, and, if the evidence so warrants, two or more may be convicted and the others found not guilty.

5. JUDICIAL NOTICE—*Supreme Court will take judicial notice of population of Cook county.* The Supreme Court will take judicial knowledge that there are over three millions of people in Cook county.

WRIT OF ERROR to the First Division of the Appellate Court for the First District;—heard in that court on writ of error to the Criminal Court of Cook county; the Hon. OSCAR M. TORRISON, Judge, presiding.

JOHN F. TYRRELL, SHORT & GUENTHER, and WILLIAM E. RODRIGUEZ, (THOMAS E. SWANSON, and CHARLES P. R. MACAULAY, of counsel,) for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, and CLARENCE E. NELSON, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiffs in error, Thomas Walsh, Frank Hayes, Roy Shields and Patrick Kane, were indicted January 13, 1922, in the criminal court of Cook county for the crime of conspiracy. The indictment consisted of ten counts, the first, fourth, fifth and eighth counts of which were *nolled* by the State on the trial. They were found guilty by a jury as charged in the indictment and sentenced to one year in jail by the court. The Appellate Court for the First District affirmed the judgment of the criminal court. Plaintiffs in error have sued out this writ of error to review the record.

Plaintiffs in error moved to quash the indictment upon the sole ground that the grand jury which returned the indictment had not been selected according to the statute. In support of their motion one of their attorneys made an affidavit in which it is stated that the jury commissioners of Cook county had not compiled a list of all electors between the ages of twenty-one and sixty years possessing the necessary legal qualifications for jury service, as required by the Jury Commissioners act, but during the year 1921, and for

a long time prior thereto, had adopted the practice of using, and did use for that year, a city directory of the city of Chicago published in 1917 as the jury list of all qualified electors of the city of Chicago; that said city directory purported to contain the names of all persons then residing in Chicago as well as firms and corporations doing business in Chicago, and that as many as 100,000 electors having the legal qualifications for jury service residing in Chicago were not included in that directory and that many persons whose names were therein listed had moved and their addresses were changed.

Martin Peterson, chief clerk of the jury commissioners, and Joseph Barnett, one of the jury commissioners, testified that since 1897 the practice in Cook county had been to use the city directory for the city of Chicago as the jury list of the electors for that city, and for the years 1921 and 1922 the 1917 city directory had been used as the jury list of electors in the city as no city directory had been published since 1917. The poll list and registration list were used as the jury list for that part of the county outside of Chicago. The city directory was used or adopted by the jury commissioners as containing its jury list, and from it names of male citizens were selected by the commissioners as possibly eligible for jury service. These names so selected were copied into a bound book kept for that purpose, and questionnaires were sent to every person whose name was selected, asking him his age, occupation, and whether or not he was a householder or a freeholder, etc. The answers to these questionnaires were also copied into the book in which the names were listed. If the answers to the questionnaire showed the person eligible for jury service, the name of the person was so marked and then written on a card and that card was deposited in the petit jury box. Answers to these questionnaires were received in about ninety per cent of the cases. The method of selecting names from

the directory by the commissioners of persons to whom they desired questionnaires sent, was to exclude the names of policemen, firemen, lawyers and doctors, and for the first year take the names on the first four pages of the directory and omit the next twelve pages, and for the second year to take the second four pages and omit the next twelve pages, and so on in that manner from year to year, and in that manner exhaust the entire directory in four years. The cards containing the names of persons possessing the necessary qualifications for jury service as determined by the commissioners were placed in the petit jury box, and then names were drawn from that box and placed in the grand jury box. The petit jury box contained at least 15,000 cards at all times and the grand jury box contained at least 1000 names at all times. All occupations not exempt from serving on juries by the statute were selected by the commissioners from the directory of the city and the poll-books aforesaid of the other towns of Cook county. When names were withdrawn from the jury boxes to fill panels they were not again placed in the box until all names therein had been drawn and until the persons whose names had been drawn had either served or had been excused. Each year the cards in the boxes are examined and those of persons who have reached the age of sixty-five years are withdrawn. Some of the cards have been in the boxes for ten years. The commissioners testified that they used the city directory as containing the jury list because it was more convenient than the poll and registration list, and, in addition, showed the occupations of the persons therein listed and showed 100,000 more voters than the poll or registration list. It saved expense, and, moreover, sufficient money had not been appropriated to employ persons to copy the names from the poll list. According to the testimony of the chief clerk it would take sixteen employees one year to compile a list of substantially all the electors of Chicago. A few

names were added to the book containing the list as above
made that were not in the directory where complaints came
to the jury commissioners that persons were not voting in
order to avoid jury service. All of the names of the per-
sons composing the grand jury which returned the indict-
ment against the plaintiffs in error were drawn from the
grand jury box from cards in that box which had been
placed there after being drawn from the petit jury box, as
aforesaid.

The contention of plaintiffs in error that the court erred
in refusing to quash the indictment cannot be sustained.
The method and manner of preparing jury lists and select-
ing jurors in counties having a population of 250,000 is
provided in the Jury Commissioners act of 1887 as amended
in 1897 and in 1919. Section 2 of that act provides that
said commissioners, upon entering upon the duties of their
office, and every four years thereafter, shall prepare a list
of all electors between the ages of twenty-one and sixty
years, possessing the necessary legal qualification for jury
duty, to be known as the jury list. The list may be revised
and amended annually, in the discretion of the commis-
sioners. The name of each person on said list shall be en-
tered on a book or books to be kept for that purpose, and
opposite said name shall be entered the age of said person;
his occupation, if any; his place of residence, giving street
and number, if any; whether or not he is a householder
residing with his family, and whether or not he is a free-
holder. Section 4 of the act provides that the commission-
ers shall from time to time select from said jury list the
requisite number of names, which shall each be written on
a separate ticket, with the age, place of residence and oc-
cupation of each, if known, the whole to be put into a box
to be kept for that purpose and to be known as the jury
box. In like manner they shall select the necessary number
of names from said jury list, which names shall each be
written on a separate ticket, with the age, place of residence

and occupation of each, if known, and put the whole in another box to be kept for that purpose and known as the grand jury box. The jurors so selected shall, as near as may be, be residents of different parts of the county and of different occupations, etc. This section further provides that not less than 15,000 names shall be kept at all times in the petit jury box and not less than 1000 names in the grand jury box.

We think that the jury commissioners made a reasonable and substantial compliance in selecting the jurors or persons qualified to serve as jurors in Cook county and making a list thereof. It is probably very true that there were quite a number of names that were competent to serve as jurors that were not placed on the list, but it is clearly apparent that it would have been a matter of impossibility to have literally complied with the provisions of the statute in making such a list. This court may take judicial knowledge that there are over three millions of people in the county of Cook. The evidence in the record shows that there are more than 550,000 registered male voters in Chicago, and, as we understand the record, the city directory aforesaid contains more than 100,000 more names of male persons between the ages of twenty-one and sixty years than there are registered male voters, and it is a fact that many of these persons are continually passing the age of sixty years and many others are dying and changing their residence and otherwise becoming ineligible for jury service, while others still are reaching the years of twenty-one and thus becoming eligible for jury service. We do not think it was the intent of the legislature to require the jury commissioners to accomplish an impossibility,—the obtaining of an absolutely complete list of all the male persons in Cook county that were eligible to jury duty. The commissioners adopted the 1917 directory twice in succession as containing the best known and practicable list of all the male persons in Cook county, and from that list they by questionnaires proceeded

to make a complete list of the male citizens of the proper qualification as jurors from the directory and to make a complete list of those names, and then to add to that list other names of such citizens qualified for such duty when they learned of such others. It also appears from the record that the jury commissioners made no discrimination against laborers or other occupations in the selection of the names for their jury list, as contended by plaintiffs in error. The substantial objects and purposes of the statute have been accomplished by the commissioners in the making of their list of jurors. The plaintiffs in error have not shown in any way that they were prejudiced in the selection and the drawing of the grand jury by which they were indicted. They have not suggested any method of selecting or making a more complete list of jurors than have been made by the commissioners, and we cannot conceive that the plaintiffs in error would have been served any better if the jury list had been absolutely complete and had contained every name in Cook county eligible to jury duty,—a thing which we have already said and shown to be an impossibility. The court properly overruled the motion to quash the indictment.

The second count of the indictment charges that the four plaintiffs in error on September 10, 1920, conspired together, with other persons to the grand jury unknown, to induce the laborers employed and working upon the construction of a building then being erected by the Chicago United Theatres, Inc., a corporation, to cease working thereon unless and until the Chicago United Theatres, Inc., a corporation, should pay the plaintiffs in error a large sum of money, to-wit, $3000. The third count charges that the plaintiffs in error conspired to prevent laborers from working on said building by intimidation and threats, with intent to extort a large sum of money from the said Chicago United Theatres, Inc., a corporation, to-wit, the sum of $3000. The sixth and seventh counts of the indictment are

similar to the second and third counts, but they charge the conspiracy to be against the Portage Theatre Company, a corporation, while the evidence showed that the correct and proper name of said company was the Portage Theatre Building Corporation. The ninth count of the indictment substantially charges that on, to-wit, September 10, 1920, and previous thereto, Chicago United Theatres, Inc., ·Portage Theatre Company, a corporation, Harold A. Drumm, and Mark Solomon and Frank P. Reger, co-partners, and each of them, respectively, were constructing and erecting certain buildings as owners, and that they, respectively, were then and there hiring and employing certain contractors and others in constructing and erecting their said respective buildings. This count then proceeds to charge the four plaintiffs in error with conspiracy against the four builders aforesaid and owners, and also a conspiracy against every one of the aforesaid builders singly and alone, to extort money from them, by similar charges as those made in the second and third counts of the indictment. The tenth count contains similar charges of conspiracy against the four builders and owners named in the ninth count and by the four defendants, and the charges of conspiracy are substantially as laid in the ninth count, varying only in the language thereof.

During the time of the transactions in question plaintiffs in error Walsh and Hayes were business agents of the Sheet-Metal Workers' Union, plaintiff in error Shields was the agent of the Painters' Union, and plaintiff in error Kane was the business agent of the Plumbers' Union. In 1919 and 1920 Chicago United Theatres, Inc., was building the Stratford Theatre, at Sixty-third and Union streets, in the city of Chicago. William Krieg, an architect associated with Walter Ahschlager, had charge of the construction of this building. In January of 1920 there was a threatened strike of workers on this building, and Krieg met plaintiffs in error Hayes, Kane and Shields at the tool house. One

of these three (it does not appear which one) told Krieg that there was a grievance regarding metal windows, electric work, carpentry, seats, and some other parts of the construction work, that would lead to a strike. Krieg asked if there was not some way to settle the matter without trouble, and suggested that one of them confer with a representative of the Chicago United Theatres, Inc., at Ahschlager's office. The following day Kane met Whitbeck, who represented the Chicago United Theatres, Inc., and Ahschlager and Krieg, at Ahschlager's office. Kane stated that he could settle all of the pending trouble for $7500, but after some time spent in conference agreed with Whitbeck to settle the matter for $3000, to be paid in installments of $500 each. One payment was to be made at once and one every two weeks thereafter until the $3000 had been paid. Five hundred dollars was paid to Kane at that time, an additional $500 some weeks later, and $1000 was paid to him in March, 1920. All of these payments were made in currency by Krieg. Some time after the middle of July, 1920, and before September 10, 1920, there was some trouble threatened by the painters on account of the seats to be installed, and Krieg met Shields in front of the Stratford Theatre building and asked him what the trouble was. Shields said the painting of the seats should have been done by local union members and not by out-of-town men. Krieg asked Shields what he meant by that, and Shields replied that he referred to the payments agreed to be made to Kane. Krieg then replied that the reason the last $1000 had not been paid was because he did not know whether Kane was turning the money over to the proper persons. He then asked Shields whether the trouble would be settled if the other $1000 were paid to him. Shields replied that it would be settled if the payment was made to him. Krieg met and paid Shields the $1000 the next day and there was no further trouble. There is some question as to whether this payment was made by cash or by check, but it is clearly

established that it was paid between July 14, 1920, and September 10, 1920. It is also established that the money paid was that of the Chicago United Theatres, Inc., which was constructing the Stratford Theatre.

The Portage Theatre was being erected in the same years, 1919 and 1920, in the city of Chicago by Portage Theatre Building Corporation. Edward Browarsky was in charge of the construction work on this building. On August 18, 1920, Walsh and Hayes came to the place where the building was being erected and made complaint on account of the construction work,—that is, of the iron work in the door frames that had been installed by members of the Ornamental Iron Workers' Union. Walsh insisted that the iron work should be torn out and that sheet-metal doors be used instead of iron doors, so that members of his union would get the work. A strike of the sheet-metal workers on the building was called. Thereafter Browarsky negotiated with Hayes for a settlement, and Hayes told him that the matter could be adjusted if he would tear out the iron work and let a contract for sheet-metal doors. Browarsky asked if that was all they wanted, and Hayes replied, "and the 'and.' " Browarsky asked him what he meant, and Hayes told him that he wanted $3000. After some dickering Hayes reduced his figures to $1500 and agreed that the iron door frames need not be removed. Browarsky then made a contract for the installation of sheet-metal doors and met Walsh and Hayes at the Hod Carrier's Hall. He there paid to Hayes $1500 in currency and showed him the contract for the installation of sheet-metal doors. Hayes took the money and contract and conferred with Walsh, who had agreed that the matter was settled. The strike was called off and the sheet-metal doors installed without taking out the iron frames. The proof shows that this building was being erected by Portage Theatre Building Corporation, and that corporation reimbursed Browarsky for the $1500 paid to Hayes. The proof further shows

that this corporation was also known as the Portage Theatre Company, but it was conclusively proved that the only corporation organized under the laws of Illinois or authorized to do business in this State whose name contains the words "Portage Theatre" was the Portage Theatre Building Corporation.

In March, 1920, while Harold A. Drumm was engaged in the construction of an apartment building known as the Drumm building the painters working on the building were called on a strike on account of the painting of some doors. Soon after the painters quit work the plumbers working on the building also quit work, for what reason does not specifically appear in the record. Drumm met Shields, who represented the painters, and was informed that the way to settle the trouble was to remove all of the stain from the doors and to contract with one Herman Bood to finish the paint work on the building, and that if he did not want to remove the stain he would have to pay the costs of so removing it, for the sick benefit of the union. Drumm went to see Bood and talked the matter over with him. A few days later he saw Bood again, and Bood told him that the trouble could be settled by the payment of $1000. Bood took Drumm to a saloon, where they met Shields and Kane. They had a few drinks together and Drumm paid Shields $1000. Shields remarked that that money made him smile, and informed Kane that everything was all right and that the plumbers could go back to work. That was on April 22, 1920. Thereafter the painters and plumbers went back to work although the stain was not removed from the doors.

Mark Solomon and Frank P. Reger, co-partners, were erecting an apartment hotel building known as the Versailles, on Dorchester avenue, in Chicago, in the year 1920. In October of that year Hayes met Solomon, who had charge of the construction work, and complained that certain metal work had been installed by the wrong union and

insisted that the work be taken out and be put in by the members of his union. Solomon did not agree with him and a strike of the metal workers was called by Hayes. Thereafter Solomon went to see Walsh and told him he was having trouble on account of the sheet-metal workers and the iron workers going out, and said: "Your man Hayes claims that the sheet metal in the frames on the elevator doors comes within your jurisdiction. The architect specifies these frames as No. 12 gauge and they were set by the ornamental iron workers. Hayes objects to these and wants them ripped out and wants $1000 from me. I have been going along with you fellows for a good many years peaceably and harmoniously." Walsh replied: "There has been a jurisdictional strike with these fellows for a good many years. We cannot handle their stuff and they cannot handle our material. The only thing to do is to take the door frames out and have them set by our men." Walsh started to the door, but Solomon called him back and asked if nothing could be done to settle the trouble. Walsh replied, "Not a damn thing; take them out." Four days later Solomon met Hayes at the place where the building was being erected, and after some negotiations Hayes finally agreed that the trouble could be settled if he would pay $500. Solomon arranged a meeting with Hayes at a saloon and met him there and paid him $500. The strike was thereafter called off and the metal door frames were never taken out and no more complaint was heard from either Hayes or Walsh.

Plaintiffs in error denied that there was any conspiracy or any corrupt motives on their part in any of the said transactions. Kane admitted receiving $500 from Krieg, but stated it was paid him voluntarily by Krieg for his assistance in avoiding trouble. The other plaintiffs in error, while admitting some of the conversations and negotiations shown by the State, denied receiving any money for themselves or for any corrupt motives.

Plaintiffs in error objected to the evidence concerning the construction of the Portage Theatre because it was shown that that building was constructed by the Portage Theatre Building Corporation and not by the Portage Theatre Company, as alleged, and moved to strike all of that evidence from the record. The objection was over-ruled and the motion denied, and the court instructed the jury that the difference between "Portage Theatre Company, a corporation," and "Portage Theatre Building Corporation," was not, as a matter of law, a material variance and did not amount to a defense. Error is assigned on these rulings of the court and the giving of the instruction aforesaid. The court erred in this ruling, but for reasons hereafter shown the error was not prejudicial or ground for reversal. Under the rule as announced in *Sykes* v. *People,* 132 Ill. 32, and in the case of *People* v. *Novotny,* 305 id. 549, distinguishing and modifying the rule as announced in the case of *People* v. *Weisman,* 296 Ill. 156, the objections of the plaintiffs in error should have been sustained as to the sixth and seventh counts of the indictment, under which the variance was clearly shown, those counts being charges of conspiracy against that company aforesaid, only.

For the same reasons just given there can be no conviction of the plaintiffs in error, or any of them, under the part of those counts that charge a conspiracy against the Portage Theatre Company, a corporation, which are the fifth and sixth and the ninth and tenth counts. Under the decision of this court in *Lowell* v. *People,* 229 Ill. 227, a charge of conspiracy against a number of individuals must be proved as laid and against all the parties as charged, and a conspiracy against a single person cannot be sustained by proof of a conspiracy against the public generally.

The real question in the record is whether or not the conviction of all of the defendants can be sustained under the second and third counts of the indictment or under the

ninth and tenth counts thereof. An examination of the facts set forth clearly establishes the guilt of the plaintiffs in error Shields and Kane under the second and the third counts of the indictment and also under the ninth and tenth counts of the indictment, all of which charge a conspiracy against Chicago United Theatres, Inc. It matters not, therefore, which count be considered as to these two plaintiffs in error, who are shown, without question, to have conspired against the Chicago United Theatres, Inc., as charged. The only proof against Hayes under the charges against that corporation is the simple fact that he was present with Shields and Kane at the meeting aforesaid with Krieg in January, 1920, in which meeting Krieg agreed to pay Kane, in the presence of Shields and Hayes, $3000 for the settlement of the strike, $1000 of which was paid to Shields thereafter and the other $2000 was paid to Kane. Hayes, however, was clearly shown to be guilty under the ninth and tenth counts of the indictment on the charge of conspiracy against Mark Solomon and Frank P. Reger, co-partners, along with Walsh, the evidence showing that Walsh and Hayes co-operated together in extorting the money and the money was actually paid to Hayes. Shields and Kane were also clearly proven guilty under the ninth and tenth counts of the indictment charging a conspiracy against Harold A. Drumm, in which case the two, operating together, extorted $1000 from Drumm and which was paid by Drumm to Shields in the presence of Kane. Hayes and Walsh were also clearly proven guilty, under the ninth and tenth counts, of a conspiracy against the Portage Theatre Company, a corporation, but which conviction could not stand by reason of the variance aforesaid, but the record contains clear and convincing proof that the four defendants were properly found guilty under some one or more of the counts for conspiracy against the other three builders, and to which charges of conspiracy no objection was interposed in the lower court and none is urged in this court.

It is contended by plaintiff in error Kane that all of his acts were performed and all money paid to him under the conspiracy charges in the second and third counts was received by him more than eighteen months before the indictment was returned, and the Statute of Limitations has run as to him. The law of this State is, in prosecution for a conspiracy, that the Statute of Limitations does not begin to run from the time the conspiracy was entered into but from the commission of the last overt act in furtherance of the object of the conspiracy. (*Cooke* v. *People,* 231 Ill. 9; *Ochs* v. *People,* 124 id. 399; *People* v. *Blumenberg,* 271 id. 180.) The proof shows that the last $1000 was paid to Shields, at his request, after July 14, 1920, which was within the Statute of Limitations and was the last act in pursuance of that conspiracy. The proof is conclusive that Kane and Shields operated together in that conspiracy and that the $1000 paid Shields was to have been paid to Kane, but Kane made no objection to that payment and made no further claim for the $1000 and committed no further act to again bring on the strike.

There is a further contention by the plaintiffs in error that the instructions, or some of them, given by the court were erroneous and that the judgment should be reversed on that ground. An inspection of these instructions shows that the court declared to the jury, in the instructions given, the law of the case to be as we have stated. There is no question that where two or more persons are charged in an indictment with a conspiracy, two of the defendants may be convicted and the other found not guilty as to such counts. *People* v. *Nall,* 242 Ill. 284; *People* v. *Smith,* 239 id. 91.

The judgments of the Appellate and of the criminal court of Cook county are affirmed, as no prejudicial error appears in the record.                    *Judgments affirmed.*