The Coal Creek Drainage and Levee District, Appellee, v. The Sanitary District of Chicago, Appellant.

Gen. No. 8,208.

Opinion filed July 2, 1928. Rehearing denied October 11, 1928.

MACLAY HOYNE, JOHN W. BECKWITH and W. H. DIETERICH, for appellant.

THOMAS E. BOTTENBERG and BARNES, MAGOON & HORTON, for appellee.

MR. JUSTICE ELDREDGE delivered the opinion of the court.

In the circuit court of Schuyler county appellee recovered a verdict and judgment against appellant in the amount of $98,089.62, damages resulting from an alleged unlawful overflowing of the lands and property of appellee. The trial court, upon a hearing, fixed the sum of $15,000 as reasonable attorney's fees for appellee to be taxed as costs and also an additional fee of $5,000 in the event the case should be appealed.

The declaration originally consisted of two counts. A demurrer to a plea was carried back and sustained to the first count and appellee abided by the count. By leave of court an additional count was filed in which, after being amended is alleged, in substance, the organization of the plaintiff as a drainage and levee district by the order of the county court of Schuyler county entered on the 28th day of December, 1896; that after said organization it acquired certain rights of way for the purpose of constructing the works of said drainage district thereon and from thence hitherto has been the owner and in possession of said rights of way; that afterwards in the year 1897, and at divers

times subsequent thereto and prior to the commencement of this suit, the plaintiff constructed its levees, interior open ditches, tile drains, pumping station, dwelling house, buildings and other works on the said rights of way; the organization of the Sanitary District of Chicago, the construction of its dams, canals and channels and that on January 17, 1900, the defendant turned the waters from Lake Michigan, Chicago River and the watersheds adjacent thereto and the sewage from the district and caused the same to flow into the Illinois River above the plaintiff district; that said waters increased in quantity during each succeeding year and defendant constructed controlling works by which it could regulate and control the amount of water and sewage flowing through the canal into the Illinois River; that by the act of the legislature, authority was granted to the defendant to flow and discharge waters from Lake Michigan and from said district through the said drainage canal and thence by divers channels and watercourses into the Illinois River, and that the amount of said flowage was to be based upon the number of people resident within the district; that there was required to be a steady, uniform flowage based upon said population with the right and authority to increase the same as the said population increased.

That up to a period ending 5 years prior to the commencement of this suit, the population of said Sanitary District was not to exceed, to wit: 2,400,000 people, and that based thereon and thereunder said Sanitary District was authorized to discharge and did discharge through said drainage canal as aforesaid a large quantity of water, to wit: the quantity of 480,000 cubic feet per minute which said flow of water, the plaintiff avers, was ample at all times to properly dilute the sewage of said district and to keep and maintain the waters of said canal so that the same should be neither

offensive nor injurious to the health of any of the people of this state; that with the period beginning 5 years prior to the commencement of this suit, the defendant, not regarding said statute, wilfully, wrongfully, improperly and unlawfully, and for the purpose not only of carrying away and diluting the sewage of the City of Chicago and the area within said Sanitary District, but also in part for the purpose of generating electrical power for the use, profit and benefit of said Sanitary District, did discharge through said Sanitary District canal a much greater flow and quantity of water from Lake Michigan and from said district through the Chicago River and also through said Sanitary District canal than was necessary or required for the purposes of said act, or authorized or permitted by it—that is to say, to keep the water of said district in such condition that the same should be neither offensive nor injurious to the health of any of the people of the State of Illinois, and vastly in excess of the amount and quantity which it was authorized and permitted to flow by and under the laws of the State of Illinois; that the defendant, during said period of 5 years prior to the commencement of this suit, so discharged not less than the quantity of, to wit, 1,400,000 cubic feet per minute of water from Lake Michigan and from said Sanitary District through the Chicago River and also through said Sanitary District channel at various times and periods during the said 5 years immediately prior to the commencement of this suit.

That particularly in times of flood in and upon the Illinois River when the waters thereof were swollen and filled the natural channel of said stream to its full capacity and did overflow the same, the said defendant, wilfully, wrongfully, unlawfully and without any authority of law, did discharge into the said Illinois River, all of the waters from Lake Michigan and from said Sanitary District, through the Chicago River

and other channels into the said Illinois River that could be sent by it through the channel of the said drainage canal, and that at times the flow of water in said channel did amout to to wit, 1,600,000 cubic feet per minute, which said respective flows of the said Sanitary District of Chicago, as above set forth and averred, did exceed the flow thereof prior to the commencement of the said 5-year period prior to the commencement of this suit, by a large amount, to wit, the respective quantities as above set forth per minute more than had been theretofore flowed through said canal and channel during the period from the commencement of the flow through said channel and ending with the period 5 years prior to the commencement of this suit; that during said period of 5 years prior to the commencement of this suit, wholly without right or authority, it has continued continuously and unlawfully to discharge said quantity of water wrongfully and in disregard of the rights of those persons owning property adjacent to the Illinois River and particularly in disregard of the rights and property of the plaintiff herein; that the effect of said excessive discharge was to raise the level of the Illinois River in times of flood and high water upon said river to a greater height than it otherwise would have been raised, to wit, to the height of 3 feet, and in times of low water in said river was to raise the level of the water in said river to a greater height than it would otherwise have been raised, to wit: to the height of 6 feet above the stage of water in the Illinois River had the same been confined to the natural flow of waters in the Illinois River and the authorized flow of the defendant herein as the same had been flowing for a period prior to 5 years before the commencement of this suit.

That prior to the 5 years before the commencement of this suit, the lands of the said plaintiff within the

said drainage district had not been overflown or flooded since the date of the construction of said levee and drainage district by the said water of the Illinois River adjacent thereto, nor had its dikes and levees been overflowed or destroyed; that from and after a period beginning 5 years prior to the commencement of this suit, solely and entirely by reason of the unlawful flow and discharge from the Sanitary District, the defendant herein, in excess of the amount which it might lawfully discharge into the Illinois River, as is above set forth, the level of the Illinois River adjacent to said drainage district was so raised and elevated that the said river on the 16th day of April, 1922 and on divers other days during said period overflowed the said levees and dikes and flooded the said district, and broke, tore down, injured and destroyed said levees and dikes, and did flood and destroy such crops and agricultural operations of the owners of lands in said district, and did render the lands therein wet, untillable, sour and unfitted for agricultural purposes and thereby rendered the works of the plaintiff district useless for the purposes for which they were constructed and did destroy and injure the pumping station, ditches and other works of the plaintiff district therein located; that by reason of said flood, it was impossible to pump said waters from the said drainage district, and that it did become necessary for the said plaintiff district to reconstruct, repair and rebuild its dikes and levees, to repair and remodel its pumping station, and to expend large sums of money for such purposes in order to again fit said plaintiff district for use of husbandry and for agricultural purposes; that while said repairs to said dikes, levees and pumping station were being made, the waters of the Illinois River stood in and upon the lands embraced in said plaintiff district for long periods of time, making said district wholly and entirely worthless and unprofitable.

That by reason of the wrongful and unlawful discharge of water from the said Sanitary District as is above set forth, and the consequent maintaining of the increased level of the Illinois River, it has become necessary to raise the height of said levees and dikes and to strengthen the same, and has increased the seepage from said river through said levees and dikes into said district, and has thereto greatly increased the cost of pumping the water from said district. The *ad. damnum* is fixed at $250,000.

The second count of the declaration is in substance as follows: that the said defendant did from the first day of January, A. D. 1921, until the date of the commencement of this suit wilfully, recklessly, unlawfully, improperly, and without any authority of law, by discharging waters from a certain Sanitary District channel owned and operated by it into the Illinois River, did overflow, flood, injure, break down, wash away and destroy the levees, dikes, pumping station, ditches, and tile drains of the said plaintiff, a Drainage District duly organized under the laws of the State of Illinois and which were located in the said county of Schuyler, and did thereby hinder and prevent the plaintiff from having the use, benefit and enjoyment thereof in so large and ample a manner as it might and otherwise would have done, and did put the plaintiff to great cost and expense in the repair, rebuilding, and reconstruction of the same, to wit: the sum of $250,000.

To the first, or amended additional count, 9 pleas were filed by appellant. A demurrer was sustained to the third, fourth, fifth, sixth and seventh pleas and overruled as to the first, second, eighth and ninth, to which numerous amended replications were filed and issues joined thereon. The defendant abided by its fourth, fifth and sixth pleas. The fourth plea sets up as special matter of defense negligence on the part of the plaintiff in the construction of the works or levees

of the plaintiff district in that it negligently adopted as part of its protection, works outside of its district which were inadequate and insufficient. If this plea presents a legal defense it could be and was availed of under the first plea, which was the general issue. The fifth plea avers that the increment of the Sanitary District water was not the proximate cause of the injury, but that the same was the construction of certain levees and dikes below the works of the plaintiff district, over which the defendant had no control, and which had the effect of raising the flood waters of the Illinois River to such a height that the embankment would have been destroyed notwithstanding any action of defendant as set out in the declaration. The sixth plea avers that, after the opening of the Sanitary District canal and the turning of the waters of Lake Michigan into the Illinois River, certain changes had taken place in the channel of the latter in the matter of filling the channel and restricting the same, over which the defendant had no control, and which had the effect of raising the flood stage of the waters therein so that the works of the plaintiff would have been destroyed notwithstanding the flow from the defendant district. The fifth and sixth pleas are subject to the same criticism made to the fourth plea. The court did not err in sustaining demurrers to these pleas.

The second plea was a special traverse denying the ownership of the real estate alleged to have been injured. Issue was joined on this plea by the plaintiff filing its similiter thereto. Subsequently, by leave of court, plaintiff also filed a replication thereto and defendant made a motion to strike the replication from the files which was overruled. The error assigned to this action of the court cannot be considered here for two reasons: first, exceptions to rulings on such motions must be preserved by a bill of exceptions. This was not done in this case. The only reference to such

a motion is in the court record. *Gaynor v. Hibernia Sav. Bank,* 166 Ill. 577; *Harms v. Aufield,* 79 Ill. 257; *Fanning v. Russell,* 81 Ill. 398; *Reed v. Horne,* 73 Ill. 598; *Gaddy v. McCleave,* 59 Ill. 182; *Snell v. Trustees of Soc. of Methodist Episcopal Church,* 58 Ill. 290; *Hay v. Hayes,* 56 Ill. 342. Second, the issue presented by the plea itself is not involved in this case. The appeal was originally taken to the Supreme Court and that court transferred it to this court on the ground that no freehold was involved. The Supreme Court in transferring the appeal to this court held: ''While a free-hold was involved originally, no question involving a free-hold is now before this court for determination and no other grounds for jurisdiction in this court appears in the records.'' This court has no jurisdiction of questions involving free-holds. It is immaterial what action the trial court took in regard to the motion to strike the replication from the files.

Several errors have been assigned to the rulings of the trial court on the admission and exclusion of evidence. In order that these may be understandingly considered it is necessary to mention some of the proofs introduced by the respective parties. The plaintiff, after proving its organization as a levee and drainage district in 1897, its construction and operation since 1898 and the construction and operation of the defendant from January 17, 1900, then introduced evidence tending to show, in substance, the following facts: The right of way of the Chicago, Burlington & Quincy R. R. Co. extends along the east side of the drainage and levee district of plaintiff and across the Illinois River. The tracks, as they approached the river from the north, ran on a trestle and in 1898 plaintiff district filled in the trestle making an embankment which became and was a part of the levees constructed by it. The dams and controlling works of the defendant district were constructed and put

in operation on January 17, 1900, on which day the waters of the Chicago River and its watershed were diverted and caused to flow into the Illinois River. This was more than one year after the completion of the levees of the plaintiff district. The controlling works of the defendant district consisted of a bear trap dam, 160 feet long, with a gate about 10 feet high which could be operated by power in opening and closing the same in a very few minutes; this dam has a maximum flowage capacity of water of 460,000 cubic feet per minute with a 6-foot head and 800,000 cubic feet with an 8-foot head. In 1907 the defendant district extended its channels and constructed a 48-foot and a 12-foot dam with gates similar to and operated in the same manner as the bear trap dam. Seven sluice gates and 7 turbine wheels were installed for the purpose of creating power to generate electricity. The maximum flowage capacity of the 12-foot dam was 100,000 cubic feet per minute and of the 48-foot dam, 400,000 cubic feet. Each of the 7 sluice gates had a flowage capacity of 400,000 cubic feet per minute and the 7 turbine wheels a capacity of 700,000 cubic feet. The total maximum flowage capacity of the controlling works is 2,280,000 cubic feet per minute. There was constructed a spillway or dam on the side of the canal at such height that, when the water in the Des Plaines River reached a certain elevation, it would spill from that river into the canal, and a rainfall in the watershed of the Chicago River sufficient to produce a current into Lake Michigan will produce a rise in the Des Plaines River. The flood in the year 1922 in the Illinois River began about March 8, and the crest or apex of the flood at Beardstown, Illinois, was April 20. On April 16, the flood became so high and the current of the river of such great velocity that that part of the levee of the plaintiff formed by the railroad embankment broke, causing the plaintiff district to be flooded

resulting in the damages complained of. On April 11 and 12 the waters of the Des Plaines River spilled into the canal of defendant and the controlling works thereof were used to prevent the Chicago River from flowing into Lake Michigan and the water from the spillway was used for the purpose of starting and aiding the current from the canal toward the Illinois River and away from Lake Michigan. The Des Plaines River itself flows into the tailrace of the power plant of the defendant and the water taken from the tailrace is caused to flow through the turbines to aid the production of electric power. During the flood period a portion of the Sag Channel owned by the defendant was also discharging water into the main channel and this water was used by it for dilution and power purposes. The total population of the Sanitary District was 2,984,966; the sewage from portions of the territory of the defendant district did not flow into the sanitary canal but into the Calumet River and after deducting the population of such portions the population of the district which did flow its sewage into the sanitary canal, was 2,880,980. The theory of the plaintiff is that the defendant was authorized by the statute creating it to flow into the Illinois River an amount of water not exceeding 20,000 cubic feet per minute for each 100,000 population of the district, unless necessary for the proper dilution of the sewage. Under this theory, upon the basis of the entire population of the district as it existed at the time in question, the plaintiff would be limited in the amount of flowage to 596,995 cubic feet of water per minute, and upon the basis of excluding therefrom that portion thereof which did not drain into the sanitary canal, it would be limited to a flowage of 576,176 cubic feet per minute. The estimates used by the plaintiff in this case are made, however, upon the basis of allowing a flowage by the defendant of 600,000 cubic feet per minute.

Upon this theory the records of the flowage of the defendant district for a number of days preceding and during the flood period showed that the flowage far exceeded the limit of 600,000 cubic feet per minute. The evidence introduced by plaintiff further tends to show that this excess flowage over and above the limit of 600,000 cubic feet per minute was used by the defendant district for the purpose of creating electrical power and was not used and was not necessary to be used for the dilution of the sewage of the Sanitary District. Plaintiff also introduced evidence, by engineers and others, that the plaintiff district had never before since its organization been overflowed or flooded and that said excess flowage of water during the time mentioned was responsible for the washing out of the railroad embankment and the other levees and dikes of the plaintiff district.

The defendant introduced evidence that a steamboat passing down the river a short time before the break in the railroad embankment took place, caused a wave which was responsible for the break; that silt deposited in the bed of the river caused the river to rise to a higher elevation than it would have done otherwise, and this condition was responsible for the damage; that levees constructed along the banks of the Illinois River below Beardstown narrowed the channel of the river and caused it to rise to an increased elevation; that the water turned into the Illinois River by the defendant district during the time mentioned only caused a rise in the river at Beardstown 4¾ to 6 inches.

Such, in a general way, is a summary of the evidence introduced to establish the contentions of the respective parties to the suit. The trial of the case took nearly 4 weeks and the evidence is very voluminous. It would be impossible in the limits of this opinion, to discuss, in detail, all the facts brought out by the tes-

timony and exhibits. The record comprises 2,692 pages and the abstract thereof consists of 1,332 pages. Some errors on the admission and exclusion of evidence have been argued and no reference made to the abstract where the same might be found. Such errors we have not considered, as we cannot undertake the burden of an original search of such a voluminous abstract or record in an attempt to discover them.

It is urged by appellant that court erred in admitting and in failing to exclude the evidence introduced by appellee to establish the population of the Sanitary District. The method pursued was the taking, as a basis, the population of Cook county as established by the United States census in the year 1920 and deducting therefrom the populations of the townships in said county, as established by the said census, which were not embraced within the limits of the Sanitary District; and also deducting therefrom the populations of such portions of such townships as were not embraced within the limits of said Sanitary District. The populations of those portions of townships which were not wholly embraced within the Sanitary District were estimated in accordance with the ratios which the portions of the area of the territory of such townships included in the district bore to the area of the territory of the whole township. It is very earnestly insisted that such evidence was not competent as not being the best evidence, should not have been admitted, and, upon the motion of appellant, should have been excluded. It is claimed that the population of Cook county may have increased between 1920, when the census was taken, and 1922 when the cause of action arose, and also, that the method used in proportioning the amount of populations of the townships lying within and without the limits of the Sanitary District was not correct. Appellant has not suggested what method would be a proper one or what would constitute the

best evidence of ascertaining the population of the Sanitary District. The statute provides that appellant shall cause a flowage of 20,000 cubic feet of water per minute for each 100,000 population of the Sanitary District. In order to comply with this law appellant must necessarily know what the population of the district substantially is at all times, but it offered no evidence on the question of the population of the district, and consequently none tending to show that the population as computed by appellee was not substantially correct. To hold that appellee should have counted or caused to be counted the number of persons living within the boundaries of the Sanitary District at the time the cause of action arose, of course, would be unreasonable, as a compliance with such rule would be impossible. The court will take judicial notice of what the population of Cook county, and of each township therein, was, as established by the census in 1920 (*Chicago & A. R. Co. v. Baldridge,* 177 Ill. 229; *People v. Brady,* 273 Ill. 178; *People v. Walsh,* 322 Ill. 195.) And such population will be presumed to continue thereafter until the contrary is shown. *Adams v. Adams,* 176 N. Y. App. 106. It is not always necessary to introduce the best evidence of an existing fact if it is beyond the ability and power of the party attempting to make such proof to do so. Such a rule would often preclude a party from proving a necessary fact and result in the defeat of justice. The appellee in this case attempted to establish the population of the Sanitary District by the best and only evidence obtainable by it. The method used, in our opinion, was not so unreasonable or unfair as to preclude a substantially accurate estimate of the population of said district. In the absence of any better evidence to the contrary we are of the opinion that the estimate proven was, at least, prima facie evidence of said population. If it was not correct appellant had the opportunity to

show such fact by better evidence if any existed. The error, if such it be, was, however, harmless, as will be hereafter seen.

Horace P. Ramey, assistant chief engineer of the Sanitary District, was a witness produced by plaintiff district. On direct examination he testified that he appeared before the committee on rivers and harbors of the sixty-eighth congress in 1924 and testified on behalf of the Sanitary District of Chicago. He was then asked the following question: ''And in that hearing you submitted an estimated population of the district for the year 1920 among other years, didn't you?'' This question was objected to by counsel for appellant, which objection was overruled, and he answered, in substance, that such estimate was submitted at that hearing before said committee on behalf of the Sanitary District of Chicago, held in the City of Washington, April 15 and May 27, 1924; that he took the figures from a population curve that had been drawn in the engineering department of the Sanitary District, from the United States census figures for 1900, 1910 and 1920; that the curve was drawn to indicate what the population had been in past years, which curve produced for future years would give a reasonable estimate of what the future population would be; the figure for 1920, given at that hearing before the rivers and harbors committee was 2,986,000; this is based upon computations made by engineers in the office of the Sanitary District and computed from the federal census of 1920; ''I am not sure it was made under my direction. It was made by subordinates in our office and I accepted it as correct and passed it on to congress. I believe it correct now too.'' It is urged that this testimony given by the witness Ramey was incompetent. The population curve was the method used by appellant itself in ascertaining the population of said District and adopted by it in the

government of the flow of water over the controlling works into the Illinois River. The witness, at the time he testified before the committee, believed the figures given by him as to the population of said district to have been correct for the year 1920 and he still believes them to be correct. The population so ascertained by the method adopted by appellant very closely approximates that estimated by the method adopted by appellee. We fail to see how appellant can complain that it was harmed in any way by this testimony, especially as appellee has tried the case upon the theory of a population of the district of 3,000,000, and a lawful flowage of water of 600,000 cubic feet per minute.

During the trial counsel for appellee handed to the court a United States census bulletin showing the population of the State of Illinois and the different political subdivisions, including Cook county, for the year 1920, for the guidance of the court. This was objected to by appellant on the ground that it did not tend to prove what the population of the Sanitary District of Chicago was in April, 1922. The court admitted it with the statement that it was for his own information and not for the jury. The objection to this exhibit is without merit.

The evidence introduced by appellee tended to prove that as a result of the flood its dikes and levees, power house and other buildings, pumping machinery and drainage ditches were destroyed or damaged; that after the flood the drainage ditches were filled with silt, rubbish and other matter and that large pools of water remained upon the lands within the district which had to be pumped out before the district could be placed in the condition it was before the flood. Evidence was also introduced showing what the cost would be to replace the appellee district to its original condition. Under the laws of this state, in order to make

the above mentioned repairs it was necessary for the plaintiff district to cause assessments to be made upon the property within its limits through proper proceedings in the county court. Appellee introduced in evidence a record of the proceedings taken in the county court for this purpose, which included an estimate of the necessary attorney's fees incurred thereby and the costs of levying the assessment. The evidence further shows that the repairs to the plaintiff district were made and paid for. It is urged that the admission of the record of the proceedings of the county court was incompetent. Counsel for appellant has not called our attention to any legal authority sustaining this view, nor do we think the argument advanced by them is persuasive of this contention. The only way the plaintiff district could proceed to obtain the money to pay for the repairs made necessary by the damages sustained on account of the flood, was by the proceedings instituted in the county court. In our opinion the cost of such proceedings is as much an element of damages as the cost of rebuilding the dikes or making any other necessary repairs. It is further contended that the cost of de-watering plaintiff district or pumping out the water that remained thereon after the flood should not be included as an element of damage. It was necessary to remove the water from the surface of the district in order to replace it in the condition it was before it was damaged. It is conceded by appellant that the proper measure of damages in this case is the cost of replacing the district in the same condition it was before it was damaged.

As stated before herein at the time the plaintiff district was organized, the tracks of the Chicago, Burlington & Quincy Railroad as it approached the river, were laid for some distance on an embankment and from the end of the embankment the tracks were constructed on a trestlework a number of feet above the

surface of the ground. The evidence showed that by some agreement between the plaintiff district and the railroad company, the former was permitted to fill in that part of the right of way on which the trestle stood so as to make a continuous embankment along that side of the plaintiff district and that the latter used such embankment as a part of its levee. The witness George B. Christie, one of the commissioners of the district, testified that he could not remember just what the terms of the agreement were, nor whether there was a written contract between the plaintiff district and the railroad company in regard to the filling in of a right of way and the use of the railroad embankment by the plaintiff district. Counsel for appellant thereupon made the following statement: "I want to now serve notice upon the plaintiff to produce at this trial any and all contracts entered into with the Chicago, Burlington & Quincy Railroad Company in reference to the filling of any trestle." Thereupon the court suggested that counsel for appellant should serve a subpoena if he desired to use any such contracts. Counsel for appellant replied that the court could order the production of it, whereupon the court suggested again that counsel obtain the same by subpoena. This ruling of the court is urged as error. Counsel for appellant did not, in fact, demand or request the court to enter a rule upon appellee to produce the contract but simply stated that the court could do so. The witness had not testified as a positive fact, that there was such a written contract, but simply that he thought there was but could not remember whether there was or not. If such a written contract existed appellant could have caused its production as suggested by the court by a subpoena *duces tecum*.

The witness Ramey identified the records of the appellant district showing the amount of water that flowed through its controlling works at different times,

and testified that some of the records were erroneous. Thereupon counsel for appellee asked the witness the following question: "Are there any other pages in this so-called record of the Sanitary District of its flowages that contains 100 per cent error?" Objection was made to this question which was overruled, to which the witness answered "No." The question might well have been worded in different language but we consider if the form used was error, it was trivial and unimportant.

Appellee made proof by the treasurer and one of the commissioners of the plaintiff district, that there were no funds in the treasury of said district available for the purpose of repair or construction of the district at the time of the flood or immediately thereafter. This evidence was competent to show the necessity of the assessment proceedings in the county court and the costs thereof as an element of damage.

Appellant offered in evidence an exhibit known as House Document No. 276, which was the report of an investigation made by a department of the federal government on flood control on the Illinois River, and also another document of computations made and published under the authority of the United States Engineering Department containing certain deductions and conclusions of government engineers. The court sustained objections thereto. Document 276, among other things contains the following: "This flood (1922) resulted from an unusually long continued period of rainfall. . . . The flood flow from the Sangamon River has undoubtedly been increased by the channel straightening and levee building operations in that river during the last few years, while the discharge from the Kankakee has been increased by the recent construction of large drainage district through the extensive Kankakee marshes in Northern Indiana. . . . The first levees of any importance were begun

in 1890. They were of sufficient height for ordinary floods, but of small cross section, and constructed by land agents to sell land rather than to prevent flooding. As late as 1904 less than half a dozen levees had been completed in the river and two of these failed during the fall of that year.'' The second document offered the unsworn opinion of an engineer on all the ultimate facts in the case. It is as follows: ''A large majority of the people along the river insist that recent floods have been caused in a large measure by the discharge of excessive amounts of water through the Chicago Drainage Canal into the Des Plaines and thence into the Illinois River. It therefore, seems necessary to remark that the flow through the Chicago Drainage Canal is kept under observation by this office, and it may be stated with confidence that the average flow through the drainage canal is approximately 9,000 cubic feet per second. There is no reason for increasing this amount during periods of flood on the Illinois River. This amount, of course, is not negligible. It has been estimated that the effect of the Sanitary District flow on the flood height of 1922 at Peoria was to raise it 18 inches; at Havana, 12 inches; and at Beardstown, 6 inches. It is clear that the Chicago Drainage Canal is not responsible for the excessive height of the 1922 flood, as so many people so vehemently assert.'' In the case of *Smith v. Sanitary District,* 260 Ill. 453, where somewhat similar documents were admitted in evidence the court held: ''The court admitted in evidence, over the defendant's objection, certain paragraphs from the seventeenth annual report of the United States geological survey. These relate to the flood stage of water in the Des Plaines river. They do not purport to be based upon measurements and are not officially authenticated in any way. They are only the estimates of the persons who are stated in the report to have made them and are hearsay, which

should not have been admitted." The same principle of law applies to the admission in evidence of the two documents offered by appellant. Appellee had a right to have his claim for damages against appellant decided by facts properly proven and not by published statements of opinions of engineers or other persons not testified to under oath and with no opportunity of cross-examination. The court did not err in excluding these offered exhibits.

Counsel for appellant do not claim in their argument that the damages fixed by the jury are excessive in any respect except that the amount thereof includes the costs of the assessment proceedings in the county court, which they contend is error. We have already passed upon the latter question, and, as under the facts proven, the jury would have been warranted in fixing a larger amount of damages, and as our attention has not been called to any evidence introduced by appellant tending to contradict or diminish the amount of damages, we presume no evidence on the subject of damages was introduced by appellant, and under these circumstances the amount fixed in the verdict cannot be considered as excessive.

Objections are urged to some of the remarks made by counsel for appellee in their arguments to the jury. To some of these no objections were made at the time. To others the remarks complained of apparently were directed to those made by counsel for appellant in his opening statement. Other remarks, however, made by counsel for appellee should not have been made, but we do not consider them of such a serious nature as should cause a reversal of the judgment.

After the trial appellee made a motion for the court to fix attorney's fees. This motion appears only in the court record, which, according to the abstract, is as follows: "Motion by plaintiff to hear evidence to tax attorney's fees as costs under the statute. De-

fendant objects to said motion as not being proper under the pleadings and evidence in this case. Motion sustained and evidence heard, and attorney's fees fixed at twenty thousand ($20,000.00) dollars; the same to be reduced to fifteen thousand ($15,000.00) dollars in case appeal is not perfected." As we understand the argument of counsel for appellant the fixing of these fees was erroneous because the appellee should have been required to have shown that it had entered into a contract obligating itself to pay a certain fee to its attorneys, and that the fee was reasonable, or that the attorneys had undertaken the prosecution of the suit without any specific fee stipulated in the contract; that appellee being a corporation, it could only enter into a contract for attorney's fees by formal action of its trustees and unless the records of the corporation show that a contract had been legally entered into between the corporation and the attorneys, no assessment of fees was proper. No authority has been cited to sustain this proposition and appellee, having received the benefit of the services performed and by its attorneys they would be entitled to receive reasonable compensation therefor. The statute creating appellant provides for the assessment of attorney's fees and has been upheld in many cases. *Ray v. Sanitary District,* 199 Ill. 63; *Jones v. Sanitary District,* 252 Ill. 591; *Gentleman v. Sanitary District,* 260 Ill. 317; *Reinke v. Sanitary District,* 260 Ill. 380; *Veete v. Sanitary District,* 260 Ill. 432; *Smith v. Sanitary District,* 260 Ill. 453; *Miller v. Sanitary District,* 260 Ill. 423; *Wheeler v. Sanitary District,* 270 Ill. 461, 464. The objection here made was not the one made in the trial court, which, as shown by the record, was made only to the court assessing any attorney's fees whatever. The record shows that the court heard evidence upon the subject of attorney's fees, but does not show that there were any objections made by appellant to any of

the evidence introduced or that the amount fixed by the court was excessive. However, this whole subject is precluded from our consideration because it was not preserved by a bill of exceptions as hereinbefore pointed out.

In the bill of exceptions it is shown that after the final arguments to the jury had been concluded, the instructions to the same given and the jury had retired to consider its verdict, the trial court, *ex parte,* told the counsel of both parties, in substance, that while he did not know what verdict the jury would render, he would not be inclined to set it aside and grant a new trial on the ground that it might be contrary to the greater weight of the evidence, for the reason that in his opinion the evidence would sustain a verdict found in favor of either appellant or appellee. It is urged by counsel for appellant that by this statement they were denied the right to argue the question of the weight of the evidence before the court on its motion for a new trial. There is no force to this contention. The statement made by the court was not made when the motion for a new trial was argued nor was it a ruling upon any question then before the court. The record shows that the motion by appellant for a new trial was argued by counsel for both sides and there is nothing therein or in the bill of exceptions to show that counsel for appellant was not accorded the privilege of presenting his views on the question of the preponderance of the evidence in support thereof.

Appellant relies upon five defenses to the right of action in this case: (1) the action is barred by the statute of limitations; (2) the damages were caused by an act of God in producing the flood; (3) that plaintiff district did not make the fill on the railroad right of way high enough or strong enough to resist the water; (4) the construction of other levees below that of plaintiff district narrowed the channel of the river

to such an extent as to cause the waters thereof to flow over the lands embraced in plaintiff district; (5) that the statute prescribes only the minimum amount of water which the Sanitary District is permitted to cause to flow into the Illinois River and that it has a legal right to cause a flowage greater than 20,000 cubic feet per minute for each 100,000 population in the district.

It is urged that a material allegation in the declaration is that the acts of appellant during the 5 years prior to the commencement of the suit created a condition different from that existing prior to the 5-year period; that as a result of the condition thus created within the 5-year period, damages accrued to the plaintiff, that the burden is upon the plaintiff to make proof of such fact by a preponderance of the evidence and that no such proof was made. *Kuhne v. Sanitary District*, 294 Ill. 430. The argument of appellant upon this question is very limited and simply to the effect that it was desired to call the court's attention to the fact that the allegation mentioned in plaintiff's declaration is material and that there is no proof of any increased operation by the defendant during the period of 5 years prior to the commencement of the suit. In our opinion neither the allegation in the declaration nor the proof thereof was necessary under the theory of the cause of action presented by the declaration, especially the amended additional count thereof. In the *Kuhne* case, *supra,* the sufficiency of the declaration was the only question before the court. The court in that case said: "Plaintiff contends that the 20,000 cubic feet is the maximum amount of water authorized to be flowed through the channel, and that the flowing of a greater amount through the channel is unauthorized and therefore unlawful. That this contention cannot be sustained seems too plain to require argument. If the defendant flowed through its channel an unreasonably large amount of water, thereby causing dam-

age to plaintiff's property, it would, no doubt, be liable for such damage. If such occurrence took place, the declaration could plainly state the facts in such language that the defendant could prepare to meet the charge. . . . There is no allegation that the water flowed in excess of 20,000 cubic feet for each 100,000 of population was unnecessary for the proper dilution of the sewage." The amended additional count contains such necessary averments and also other causes of liability, other than a greater flowage in the 5 years before the suit was commenced than in the preceding 5 years, to wit: a greater flowage than allowed by law based on population; a flowage not continuous as required by the statute; and a flowage for the purpose of creating electricity and not to dilute sewage. It is plainly set out in this count that while the Illinois River was in flood during the months of March and April, 1922, appellant caused an excess of water over and above what was necessary to dilute the sewage and comply with the requirements of the statute, and that such excess water caused the damages complained of. Appellee could not bring its action for damages to its property until such damages occurred and the cause of action accrued. It was held in the case of *Jones v. Sanitary District,* 252 Ill. 591, in discussing an alleged error of the trial court in sustaining a demurrer to the plea of the statute of limitations, interposed by the appellant: "The improvement known as the drainage channel is permanent in character, but it is not alleged that appellee suffered damage by reason of its construction. The construction and continuance of the channel more than two hundred miles from appellee's land is not necessarily an injury. It is the use that has been made of it that it is complained has caused the injury. . . . If, as appellant contends, the statute of limitations runs as to such actions as this from the date the drainage channel was completed to Lockport

and the flow of water turned on, it is possible for a party to be barred before he has suffered any injury whatever. It is the injury sustained which is the cause of action, and the statute does not begin to run before the cause of action accrues. The permanency of the injury is the test as to whether damages for all time must be assessed.'' Said section 20 has also been construed to mean that it is the duty of appellant district to maintain a continuous and even flow of water. The evidence in this case shows that at the time of the damage complained of and for a number of days prior thereto, the appellant did not maintain a constant and continuous flow of a certain amount of water, but on the contrary, during the middle of the days mentioned much less amount of water was permitted to flow through the controlling works than required by the statute, to wit, at times such flowage did not exceed 128,000 cubic feet per minute, but during the evening and early morning hours the flowage was increased to an amount as high as nearly 900,000 cubic feet per minute. The evidence further shows that this immense increase of flowage was necessary to create electrical power for lighting the City of Chicago, and not for the purpose of diluting the sewage. There was evidence further tending to show that the increasing and decreasing of the amount of flowage as mentioned created waves of water which materially added to the velocity and quantity thereof in the lower reaches of the river. The statute requires that the amount of flowage shall be constant and permanent, although this would not preclude an increase in the flowage from year to year. Before appellant district could avail itself of the statute of limitations it was necessary to prove that the flowage of the water into the Illinois River had been continuous and permanent in amount as defined by the statute. *Jones v. Sanitary District, supra; Kuhne v. Sanitary District, supra.*

In our opinion the defense that the destruction of the property of plaintiff district was caused by an act of God cannot be sustained. The facts in this case, shown by the testimony of the officers of the defendant district itself, are that more water was permitted to flow from the Sanitary Canal into the Illinois River than was necessary for the proper dilution of the sewage and that during this flood period the flowage amounted, at times, to nearly 900,000 cubic feet per minute and that such excess flowage was used not for the purpose of diluting the sewage primarily, but to create electric power. The term "act of God" has been defined innumerable times by different authorities, and in many different ways; but in every definition thereof which we have examined, it is stated that it must be an act of nature which implies entire exclusion of all human agency. Volume 1, Words and Phrases, p. 118 *et seq.;* Volume 1, Bouvier's Law Dictionary, 3 ed., p. 116 *et seq.* In the case at bar the contribution of the human agency of appellant in discharging the excess of water mentioned cannot be excluded. That such excess of water largely contributed toward the injuries received and the damages resulting therefrom is amply sustained by the proofs and is self-evident. The evidence tends to show that the amount of the excess over 600,000 cubic feet per minute raised the height of the Illinois River at Beardstown 7 inches, and that 32 per cent of all the water flowing in the Illinois River at that time came from the defendant district. Moreover, whether the rainfall which contributed to the overflow of plaintiff district was so unusual and unprecedented that the damage occasioned thereby might be rightly regarded as caused by an act of God so as to relieve appellant from liability was a question of fact to be determined by the jury from the evidence. *Chicago, P. & St. L. R. Co. v. Reuter,* 223 Ill. 387; *Ohio & M. Ry. Co. v. Thillman,* 143 Ill. 127.

Another contention of appellant is that section 20 of the act, Cahill's St. ch. 42, ¶ 359, establishes simply a minimum of the amount of water which it is the duty of defendant district to maintain and that there is no limit to the amount which it may cause to flow into the Illinois River above such minimum. It is evident that such a construction of this section was never contemplated by the legislature. It is provided in this section that defendant district shall construct and maintain its channels of sufficient size and capacity to produce a continuous flow of water of at least 200 cubic feet per minute for each 1,000 of the population of the district drained thereby and that the same shall be maintained of such size and in such condition that the water thereof shall be neither offensive nor injurious to the health of any of the people of the state and shall thereafter maintain the flow of at least such quantity of water. There is nothing in this section which directly or by implication gives defendant district the power to discharge an unlimited quantity of water into the Illinois River. Such an unlimited power might result in the annihilation and destruction of all property along the river. This section does not authorize the defendant district to discharge any greater amount of water into the river than is necessary to dilute the sewage so that the same shall be neither offensive nor injurious to the health of the people, provided, that the minimum amount stated shall at all times be maintained. As stated in the *Kuhne* case, *supra:* ''If the defendant flowed through its channel an unreasonably large amount of water, thereby causing damage to plaintiff's property, it would, no doubt, be liable for such damage.'' To the same effect also is the *Jones* case, *supra.*

In section 6 of an act in relation to the Sanitary District of Chicago, Cahill's St. ch. 42, ¶ 385, approved May 14, 1903, it is provided: ''That the power made available by the works constructed under the provi-

sions of this act shall be converted into electrical energy, etc." Appellant maintains that this section authorizes the defendant district to discharge water for the purpose of creating electrical power. The effect of this section is only to authorize and direct the defendant district to convert the power made available by its works through the lawful use thereof, into electrical energy. It does not authorize defendant district to discharge an excessive amount of water over and above a reasonable amount necessary for the proper drainage of the district for the purpose of creating electrical energy.

It is also urged as a defense that the plaintiff district should have constructed its embankment on the right of way of the railroad company strong enough to resist the flood waters of the river. This embankment was constructed before defendant district was organized and the evidence shows that its construction was sufficient to resist all the floods of said river until that of 1922. While it might have been the duty of the plaintiff district to have constructed said embankment so that it would be able to withstand the usual and ordinary overflows and floods of the river, no duty was imposed upon it by law to anticipate and guard against the organization of the Sanitary District and the discharging into the river by it of a vast volume of water.

The defense that the defendant district is not liable for the damages occasioned for the reason that various drainage districts below that of appellee, by the construction of levees, had narrowed the channel of the river and thereby contributed to raising the height of the water therein, cannot be sustained. The cause of action in this case is not for damages caused by the lawful discharge of waters into the river under the provisions of the act, but for the unlawful discharge of more water than was authorized by the act. The

fact that other drainage districts may have contributed to the condition which caused the damage is not a defense in this case. *Kankakee & S. R. Co. v. Horan,* 131 Ill. 288; *St. Louis Bridge Co. v. Miller,* 138 Ill. 465; *Chicago & A. R. Co. v. Vipond,* 212 Ill. 199; *Nordhaus v. Vandalia R. Co.,* 242 Ill. 166.

What we have said herein answers most of the criticisms made to the instructions given on behalf of appellee. Error is assigned on the refusal of the trial court to give certain instructions offered on behalf of appellant. A total of 84 instructions were offered by both parties, of which appellant offered 55 and of these 32 were given. The burdening of a trial court with the duty of examining and passing upon 84 instructions is most unreasonable and unnecessary. *People v. Boston,* 309 Ill. 77; *Freesen v. Scott County Drainage & Levee Dist.,* 283 Ill. 536; *Chicago, P. & M. R. Co. v. Mitchell,* 159 Ill. 406. The issues in this case were not so numerous or complicated as to require such a vast number of instructions. To require a jury of laymen to consider and apply 84 legal propositions to the evidence is an absurdity. In our opinion the 32 instructions given on behalf of appellant cover all the legal propositions necessary for the jury to consider in order to properly guard appellant's interests and, therefore, there was no error in not giving the refused instructions.

There is no reversible error in the record and the judgment is affirmed.

*Affirmed.*